Eric Matos **RIVERA, et al., Plaintiffs,**

v.

**FLAV–O–RICH, Defendant.**

**Civ. No. 93–2187 (HL).**

United States District Court, D. Puerto Rico.

Feb. 10, 1995.

374

Rafael Baella–Silva, Baella & Barcelo, San Juan, PR, for plaintiffs.

Vincente Santori–Coll, San Juan, PR, for defendant.

## OPINION AND ORDER

LAFFITTE, District Judge.

"Puerto Rico is the beneficiary of two great legal systems [: civil and common law]. Out of the interaction and synthesis of these systems, but without eclipsing or banning one or the other, a new *Derecho Puertorriqueño* can and does emerge." *Diaz Irizarry v. Ennia, N.V.,* 678 F.Supp. 957, 962 n. 5 (D.P.R.1988).

Before the Court is defendant Flav–O–Rich's Motion for Summary Judgment. For the reasons stated below, the Court hereby **grants** defendant's motion.

## I. BACKGROUND

Defendant Flav–O–Rich is an ice cream manufacturer incorporated in and having its principal place of business in Kentucky. Complaint ¶ 8. Antonio Berrios Fuentes ("Antonio") purchases ice cream from the Flav–O–Rich ice cream warehouse in Minillas, Puerto Rico. Antonio Depo. Tr. 10. Flav–O–Rich gave Antonio an account number, 1101. *Id.* If Antonio purchased $2,500.00 or more in products per month, he would receive a 25% discount on said products. *Id.* at 15–16. If he did not purchase said amount, he received an 8% discount. *Id.* at 16. Antonio does not have a contract or agreement with Flav–O–Rich and he does not receive payment or benefits from Flav–O–Rich. *Id.* at 9–10, 16, 20. Flav–O–Rich does not control the way in which Antonio sells Flav–O–Rich products. Antonio sets the selling prices for the products and chooses where to sell them. *Id.* at 9, 14. He does not wear a Flav–O–Rich uniform. *Id.* at 26.

Antonio owns a van from which he sells Flav–O–Rich products. *Id.* at 21–22. He also sells other products out of the van. *Id.* at 23–25. The van has decals and stickers advertising Flav–O–Rich, and the van broadcasts the Flav–O–Rich jingle over a loudspeaker. *Id.* at 22. Flav–O–Rich does not require Antonio to use said decals and jingle; rather, Antonio chooses to use said advertising to let his customers know that he sells Flav–O–Rich products. *Id.*

Antonio's brother, Angel Berrios Fuentes ("Angel"), drives Antonio's van and sells

Flav–O–Rich products bought by Antonio from the Flav–O–Rich warehouse. *Id.* at 11–12. Antonio pays his brother Angel a commission of about 20–25% of Angel's sales' profits. *Id.* at 13. Angel himself has no contact with the Flav–O–Rich warehouse and does not buy Flav–O–Rich products. Angel Depo.Tr. at 9–10.

Plaintiffs, a minor and his sister and mother, have brought suit alleging that on June 24, 1993 at approximately 7:30 p.m. Angel was selling ice cream from Antonio's van in plaintiffs' neighborhood. Complt. ¶ 9. A group of minors climbed on the rear of the van. *Id.* at ¶ 10. Angel allegedly told the children that he was not responsible for any harm that might happen to them, and then proceeded to drive away. *Id.* at ¶ 11. When the minors realized that the van was leaving their neighborhood, the minors jumped from the van. *Id.* at ¶ 12. The plaintiff minor upon jumping off of the van allegedly hit the pavement and was brought to the hospital due to his serious injuries. *Id.* at ¶¶ 13–15.

Plaintiffs then filed suit in this Court against only Flav–O–Rich, the ice cream manufacturer. Defendant Flav–O–Rich has filed a motion for summary judgment. Plaintiffs have opposed said motion, and defendant has filed a reply thereto.

## II. STANDARD

■ Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The opposing party must then designate specific facts that show that there is a genuine triable issue. *Id.* at 324, 106 S.Ct. at 2553; Fed.R.Civ.P. 56(e). The nonmoving party cannot rest upon mere conclusory allegations, improbable inferences and unsupported speculation. *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993), *reh'g denied,* March 12, 1993. Likewise, the nonmoving party cannot rest on the pleadings but should set forward specific facts showing that there are genuine triable issues. *Id.* Supporting and opposing affidavits shall be based upon personal knowledge and set forth facts that would be admissible into evidence at trial. Fed. R.Civ.P. 56(e).

■ A fact is material, if under applicable substantive law, it may affect the result of the case. *Ortega–Rosario v. Alvarado–Ortiz,* 917 F.2d 71, 73 (1st Cir.1990). A dispute is genuine only if there is conflicting evidence that requires a trial to resolve the discrepancy. *Id.* In determining whether summary judgment is warranted, the court views the facts alleged in the light most favorable to the non-moving party and must indulge all inferences in favor of that party. *Rossy v. Roche Products, Inc.,* 880 F.2d 621, 624 (1st Cir.1989); *John & Kostas Service Station, Inc. v. Cumberland Farms, Inc.,* 948 F.2d 821, 822 (1st Cir.1991).

## III. DISCUSSION

Both parties agree that there are no material facts in dispute. Defendant Flav–O–Rich argues that Antonio was not an employee nor an independent contractor of Flav–O–Rich, but rather a purchaser of products sold by Flav–O–Rich. Therefore, Flav–O–Rich maintains that it is not liable for the alleged negligence of Antonio's brother, Angel. Plaintiffs contend that Angel is an employee or an independent contractor working for his brother Antonio, who is an independent contractor of Flav–O–Rich in that he has a distributor number with the company and receives a 25% discount when he sells at least $2,500 in Flav–O–Rich products. Plaintiffs further argue that Flav–O–Rich is liable for the negligence of its independent contractor in that the peculiar risk of an ice cream truck around children is foreseeable and that Flav–O–Rich was deriving an economic benefit from said business despite its riskiness.

### A. The Applicable Law

■ The first question before this Court is what law is to be applied. In order for the law to serve the people, it must reflect reality. In a civil law system, legislation and custom are primary authority. A.N. Yiannopoulos, *Jurisprudence and Doctrine as*

*Sources of Law in Louisiana and France, in The Role of Judicial Decisions and Doctrine In Civil ·Law And Mixed Jurisdictions* 69 (ed. Joseph Dainow, 1974). Jurisprudence, doctrine, conventional usages, and equity are secondary authority. *Id.* at 70. A series of cases are utilized only as a supplement to deficient legislation. *Id.* at 79. This is contrasted with a common-law system where *stare decisis* is primary authority. Whereas the civil law was developed as a comprehensive, logical and cohesive system of law, the common-law system is built on a case-by-case basis.

Puerto Rico is a mixed-law jurisdiction.[1] It has a Civil Code that applies to areas of law such as persons, property, ownership, and its modifications, different ways of acquiring ownership, obligations and contracts that are now codified as the thirty-first title of the Laws of Puerto Rico.[2] However, there are a multitude of other titles to Puerto Rico laws that are drafted in the common-law fashion. Moreover, Puerto Rico is a part of the United States federal court system, which follows the tradition of Anglo–American common law.[3]

In mixed-law jurisdictions, such as in Puerto Rico, due to the inherent differences between civil- and common-law systems, a tension arises as to the methodology utilized by judges in their decisionmaking.

[W]hen no rule for a particular situation in the instant case can be found in the Code, case-law methodology would lead the judge to formulate a rule exclusively from the facts of a previous case. This is antithetical to civilian methodology, which requires the judge to search for legal con-

cepts in the Civil Code delimiting a pattern of competing interests closely resembling the interests pressing for recognition in the instant case ... [E]ven when there is no legal precept in the Code upon which the judge may fashion a rule by analogy to govern the instant case, he still should not use pure case-law reasoning to arrive at a rule for the case. Doing so may cause him to fashion a rule for the case by selecting facts from a previous case in a way that is inconsistent with the guiding values of the Civil Code system.

Jean–Louis Baudouin, *The Impact of the Common Law on the Civilian Systems of Louisiana and Quebec, in The Role of Judicial Decisions and Doctrine in Civil Law and Mixed Jurisdictions* 1, 14–15 (ed. Joseph Dainow, 1974).

In 1979, the Supreme Court of Puerto Rico addressed and attempted to resolve this tension in an opinion authored by Chief Justice Trías Monge. *Valle v. American Int'l Ins. Co.*, 108 D.P.R. 692 (1979). In *Valle*, the suit involved the damages resulting from a six car chain-reaction collision. Plaintiff, as the driver of the second car, brought a tort suit against the driver of the third car.

Although the Vehicle and Traffic Law of Puerto Rico did not address the situation of a standing car's negligence, the Supreme Court found that the general law of torts did apply. The *Valle* Court expressed a fear that the civil law system had been and would continue to be eroded by the Supreme Court's trend in turning to American doctrine, law and theories where the civil law and relevant Spanish case law existed. Accordingly, the Court held only the Civil Code

---

1. José Trías Monge, *The Structure of the American Legal System*, 51 Rev.Jur.P.R. 11, 12 (1982) ("Puerto Rico has. a mixed legal system. The Spanish Civil Code of 1888 and the Commerce Code of 1885, with alterations, are still in effect in Puerto Rico as well as many other basic laws of Spanish origin. The system still has a Civil Law cast, but American law and techniques dominate the fields.")

   Despite the obviousness that the genesis of Puerto Rico's laws lies in both the Spanish Civil Code and the Anglo–American common law, the Puerto Rico Supreme Court has never stated or ruled in any of its hundreds of opinions the reality that Puerto Rico is a mixed jurisdiction. The Court while methodically ignoring the mixed

nature of Puerto Rico's legal system, highlights its claim of a "civil jurisdiction."

2. For those with a penchant for a historical background to the Puerto Rico Civil Code *see* Luis Muñoz Morales, *El Código Civil de Puerto Rico*, 1 Rev.Jur.U.P.R. 75 (1932); Manuel Rodriguez Ramos, *Breve Historia de los Codigos Puertorriqueños*, 19 Rev.Jur.U.P.R. 233 (1950).

3. *See* Manuel Rodriguez Ramos, *Interaction of Civil Law and Anglo–American Law in the Legal Method in Puerto Rico*, 23 Tul.L.Rev. 355 (1949) (discussing the interplay of the two systems in the law of Puerto Rico).

applied to this case as the Code governed the law of torts in Puerto Rico.

In pronouncing its decision, the Court went further and stated that "all [prior] cases which tend to solve civil law problems through common law principles are reversed." *Valle,* 108 D.P.R. at 694. Common law, whether it be from the United States, England, or Canada, is to be used only as "a point of reference for comparative law," the Court further stated.

The fears expressed by the *Valle* Court and its progeny are common among jurisdictions which are mixed and surrounded by a national common-law system.

> In both Louisiana and Quebec, there seems to have been ... a fear of the loss of legal identity, a fear that these two jurisdictions would eventually lose their 'civilian heritage' and melt slowly into the neighboring common-law system ...

Baudouin, *supra,* at 1.

In order to attack this fear, courts in mixed jurisdictions are likely to offer the extreme solution of banishing the common law. As seen above, the *Valle* court overruled all cases based on common law that were civil-law cases and proscribed the use of common law except as a point of reference for comparative law. In Quebec, "scholars have often objected to the introduction of common-law concepts and interpretive techniques, arguing that the Quebec private-law system would slowly lose its identity and become common law by adopting common-law techniques, common-law terminology, or common-law ideas." Baudouin, *supra* at 1.

Although this approach may be popular for its semblance of containing the encroachment of common law into the area of civil law, said approach's isolationism is unrealistic. For Puerto Rico, the approach fails to honestly deal with the reality of civil-law methodology, Puerto Rico's legal, political, social and economic systems.

### 1. Case Law Is An Integral Part Of A Civil Code System

"The essential difference [between civil-law and common-law methodology] may merely relate to the degree of sanctity with which precedents are regarded." Yiannopoulos, *su-*

*pra,* at 79. As stated previously, precedent cases are primary authority for common-law jurisdictions. In a civil-law jurisdiction, case law can be primary if it is presented as such a long line of precedents that the case law has become customary law. Otherwise, case law is secondary authority. And either as customary law or as a single case, precedent is imperative to filling in the gaps or making up for the deficiencies of the legislation in a civil-law jurisdiction.

The importance of case law is recognized by Puerto Rico's Civil Code. Under the Code, "when there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration." P.R.Civ.Code art. 7 (1930), P.R.Laws Ann. tit. 31, § 7 (1968).

Civil–law's utilization of case law is important for two reasons. First, case law as a secondary authority in civil-law or mixed-law jurisdictions makes available other resources to ensure just decisionmaking if legislation and custom do not provide rules for the fact situation at hand. Yiannopoulos, *supra,* at 71. Second, case law permits the law to evolve and adapt to the marked political, economic, and social changes in a society. *Id.* at 70.

> If legislation were to keep pace with these developments, necessary reforms ought to be enacted daily. This would not be desirable, even if it were possible, because frequent reforms tend to deprive legislation of its cogency and of the respect of the courts and individuals. Nor can custom supply the requisite reforms, because the formation of customs is too slow to cope with the growing demands of a developing society.

*Id.* at 70–71.

For example, the legislature had to repeal or amend all antiquated civil laws that defined a wife as subordinate to her husband. P.R.Laws Ann. tit. 31, §§ 282–284, 286–287 (1983). These amendments occurred in 1976 and 1984, five years and thirteen years, respectively, after the United States Supreme

Court ruled that the fourteenth amendment of the United States Constitution protected women from discrimination on the basis of their gender. *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (state statute preferencing men as administrators of estates was unconstitutional). If case law had been used to modify said petrified laws, rather than the cumbersome process of the legislature, most likely their repeal and amendments would have occurred closer in time to the Supreme Court's pronouncements.

## 2. The Reality Of Judicial Usage Of Case Law

As referral to custom is a requirement in the civil-law system, it is logical that reference to common-law cases would be made in civil-law cases. *See id.* (Louisiana courts "will of necessity resort to appraisals of customs within [the] state boundaries and within our national borders because [they] are a part of a larger community of common customs in many areas of law."); *see also* Joseph Dainow, *Notas Introductorias al Código Civil de Louisiana,* 23 Rev.Jur.U.P.R. 307, 325 (1954) (discussing the use of cases in Louisiana court decisions). For example, whereas reference to most of the sister civil-law jurisdictions, not including Spain and Louisiana, is obstructed by the barrier of language, the common law of the United States is accessible through the shared language of English.

Also, as seen above, judicial precedents in civil-law jurisdictions are necessary as a secondary source of law to supplement legislation. As such, "[t]he jurisprudence is legislation and customary law as reflected in decided cases." Yiannopoulos, *supra,* at 75. Therefore, when a judge sitting in a mixed-law jurisdiction decides a civil-law matter, it is understandable that he/she would rely on said jurisprudence in cases where legislation and custom do not furnish rules for the decision. Once reliant upon cases, the common-law methodology would surface naturally with an application of the precedent to the case at hand. In Quebec and Louisiana, judges have adopted the common-law format and not the French format, "thus encouraging direct references to previous cases." *See,* Baudouin, *supra,* at 16. This adopted methodology is also present in the uncodified civil law systems of Ceylon, Scotland, and South Africa. T.B. Smith, *The Preservation of the Civilian Tradition in "Mixed Jurisdiction",* 35 Rev.Jur.U.P.R. 263, 269 (1966).

A judge deciding a civil-law case as if it were one of common-law is the inevitable consequence of Puerto Rico's mixed-law system as well. Said system logically lends itself to the blending of civil-law with common-law judicial attitudes and decision-making. *Id.* at 8. And as seen in Puerto Rico, despite the occasional outcry for a purist approach when addressing civil-code legal areas,[4] the actual practice of the Puerto Rico Supreme Court is to utilize a case method approach and refer to common-law cases from the United States in order to fill in the inevitable gaps of the Civil Code.

*Arthur Young & Co. v. Vega,* 94 J.T.S. 75 (1994), is a case exemplifying Puerto Rico Supreme Court's usage of common law cases. In *Arthur Young,* the Supreme Court of Puerto Rico in deciding a contract question, which is a question of the Civil Code, nevertheless adopted doctrines and interpretive norms of the common law. *Vega,* 94 J.T.S. at 11968. The court stated that the common law enriched the civil law of Puerto Rico. *Id.* The court then utilized a combination of Puerto Rico, Spanish, and Anglo–American case law and commentary to decide the case.

In addition to resorting to common law despite the applicability of the Civil Code, the Puerto Rico Supreme Court has also created new causes of action under the Civil Code through judicial decisionmaking. In *Santini Rivera v. Serv Air, Inc.,* 94 J.T.S. 121 (1994), after analyzing Puerto Rico case law and commentary, the Supreme Court veered from the Civil Code and created a new cause of action under Article 1802 of the Puerto Rico Civil Code. Said cause of action

---

4.  *See* José Trías Monge, *El Choque de Dos Culturas Jurídicas en Puerto Rico,* 375–400 (1991). In his zealous defense of the Civil Code, Trías, Puerto Rico's leading civil law and constitutional law scholar, goes as far as to suggest the banishing of the Federal Court as a remedy to avoid what he refers to as the improper application of case law to civil-code issues. *Id.* at 400.

permits suits by relatives of an employee who has suffered Law 100 discrimination in the workplace. *Id.* at 185. And in *Figueroa Ferrer v. Commonwealth of Puerto Rico,* 107 D.P.R. 250 (1978), the Puerto Rico Supreme Court created a new ground for divorce that did not exist under the Civil Code. *See* P.R.Laws Ann. tit. 31 § 321; P.R.Civ.Code art. 164 (1902).[5]

It is important to note, moreover, that the result of case usage is not the demise or the overtaking of Puerto Rico's civil code. As stated by a Louisiana civil law scholar, "la adopción de una solución del derecho común para un problema particular no significa la incorporación de todo el derecho común en general." Dainow, *supra,* at 325 (the adoption of a common-law solution for a particular problem does not signify the total incorporation of the entire common law) (translation ours). It is rather an efficient and logical problem-solving method that utilizes the best and most readily accessible resources.

### 3. The Shared Ties To Common Law

As adherents of the civilian tradition, we initially examine the sources in our own system and our own law for enlightenment, but we must also make our system live in the context of its national existence. We benefit from this approach, and our search for and use of the law and the jurisprudence of common-law states for these purposes need not detract from, taint, or limit our search for good civilian methods in the best of its tradition.

Mack E. Barham, *A Renaissance of Civilian Tradition in Louisiana, in The Role of Judicial Decisions and Doctrine In Civil Law and in Mixed Jurisdictions* 38, 50–51 (ed. Joseph Dainow, 1974). Puerto Rico, as a part of the United States, shares United States citizenship, laws, a common market, customs, and the goal of logical and reasoned decisionmaking with the nation. The shared political and economic realities between Puerto Rico and the United States make it beneficial and sensible for our courts to refer to the case law of the other United States courts.

### a. Shared Political Ties

Although Puerto Ricans share a common language with Spain, Puerto Rico's relationship with her is that of a distant relative. Since 1898, as a result of the change of sovereignty, Puerto Rico's society has grown up and away from Spain through its alignment with the United States. Puerto Rico's political system, as a consequence, is modeled after that of the United States, not of Spain. Puerto Rico's government employs the checks and balances of the three branches of the United States federal government system. P.R. Const. arts. III, IV and V.

The Civil Code is based on the premise that civil-law judges, as mere civil servants selected for their technical expertise, should simply operate as technicians in deciding cases through the application of the Civil Code. Therefore, said judges are resolving cases by mechanically determining the general principle able to be extracted from the complete and perfect system of laws of the Civil Code. James L. Dennis, *Interpretation and Application of the Civil Code and the Evaluation of Judicial Precedent,* 54 La. L.Rev. 1, 5 (1993).

The need for the civil code system's legislative supremacy evolved as a form of separation of judicial power from monarchs.

> It is probable that the idea of the supremacy of legislation over other sources of law finds its origins mostly in political and sociological reasons. In prerevolutionary France, the absolutism of monarchy had bred a very heavily politicized justice. The royal judges, appointed directly by the king, were not as distant and independent from politics as their English brothers One of the main concerns of the French Revolution was precisely to separate sharply the judicial and legislative functions.

Baudouin, *supra,* at 7.

However, these fears which caused the origins of civil law do not exist in Puerto Rico's democratic society where both the executive and the legislative bodies are in-

---

5. For the most recent application of judge-made law to civil law *see Nieves Velez v. Bansander*

*Leasing Corp.,* 94 J.T.S. 115 (1994).

volved in the selection of the judiciary. Because Puerto Rico's judiciary is a third branch that is appointed by the governor and subject to the Legislature's approval, the judiciary's independence is guaranteed. P.R. Const. art. V, § 8. Accordingly, the civilian's concern for usage of common law, which permits a more interpretive and less technical role for the judge, is assuaged by the checks and balances set forth in the governmental system.

### b. Shared Laws

Puerto Rico, due to its history and its political status, shares the majority of its legal principles and laws with the United States and its common-law system. Federal law applies to Puerto Rico with the same force and effect as in the mainland United States. Most importantly, as Puerto Rico is subject to America's federalism, the Civil Code, as well as all Puerto Rico laws, are subordinate to the Constitution of the United States.

There is no jury trial right in civil cases in Spain.[6] And consequently, there is no right to jury trial under the Puerto Rico Civil Code. However, because Puerto Rico is part of the federal court system, when diversity cases are tried in federal court, the Constitution demands the use of a jury trial in cases involving legal matters despite the absence of a right to jury trial under the Civil Code. *See Marshall v. Perez Arzuaga*, 828 F.2d 845, 849 (1st Cir.1987) ("The Seventh Amendment, however, most decidedly affords litigants in federal court in Puerto Rico the right to trial by jury. . . ."), *cert. denied sub. nom. Avis Rent–A–Car v. Marshall*, 484 U.S. 1065, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988).

The criminal laws, the rules of civil procedure, the body of corporate, commercial, and labor law, as well as numerous other areas of law, continue the transposition of American laws into the Puerto Rican legal system. *See,* David Rivé Rivera, *La Doctrina de "Stare Decisis" y el Derecho Civil en Puerto Rico*, 63 Rev.Jur.U.P.R. 131, 134–35 (1994); José Trías Monge, *The Structure of the American Legal System*, 51 Rev.Jur.U.P.R. 11, 12 (1982) ("The [Puerto Rican legal] system still has a Civil Law cast, but American law and techniques dominate the fields."). An example of the commonality of reliance upon Anglo–American law is seen in *Municipality of San Juan v. Great Am. Ins. Co.*, 117 D.P.R. 632, 17 Off.Transl. 757 (1986). The Supreme Court of Puerto Rico in *Great Am. Ins. Co,* which was decided after the *Valle* decision, declared that in the area of insurance law, although the Insurance Code applies in Puerto Rico, American common law may be used. *Great Am. Ins. Co.,* 17 Off.Transl. at 761–62.[7]

Through the thorough reporting of cases and the multitude of scholarly law journals in the United States, lawyers and courts have access to a wealth of law. And the Anglo–American system has numerous, comprehensive, and well-organized "finding tools" to assist lawyers in their research of said law: digest systems, annotated statutes, periodical indexes to countless law review articles and other periodicals, and computerized on-line legal research systems. It is nonsensical to ignore these abundant sources and the technology that help to find and make the application of law easier and more just in order to appease a romantic notion that time has stopped and the Civil Code and Spanish or European commentaries alone apply. Again, law and the approach to law must reflect reality.

> We have held that the insurance field is governed by the Insurance Code, Act No. 77 of June 19, 1957 (26 L.P.R.A. § 101 *et seq.*), insofar as the Civil Code operates as supplementary law. *Serrano Ramírez v. Clínica Perea, Inc.,* 108 D.P.R. 477, 481–82 (1979). Following this fact, the practice of this Court has been to use the most advanced rules in North American law and civil law . . . In the proper occasions it is convenient to resort to those law systems in search of guidance.
> *Great Am. Ins.,* 17 Off.Transl. at 761–62.

---

**6.** The jury system in Spain has gone through alternating periods of abolition and implementation. Article 125 of Spain's present Constitution—effective 1978—authorizes the government to institute jury trials in certain criminal cases, as provided by statute. *See* Francisco Davo Escriva, *El Tribunal del Jurado: Reflexiones acerca de su desarrollo constitucional,* (1988); Oscar Alzaga Villamil, *Comentario Sistemático a la Constitución Española de 1978* (1978); Carlos E. Mascareñas, *Nueva Enciclopedia Jurídica* (1971).

**7.** Specifically, the court stated:

The position against utilizing Anglo–American case law seems more reactionary than practical when viewing the dearth of references by civil-law purists to Louisiana commentary and law. Louisiana law is based on the Roman, French, and Spanish civil code. Dainow, *supra* at 312. And Louisiana's Civil Code is the source of many of Puerto Rico's laws. *See, e.g.,* P.R.Laws Ann. tit. 31, §§ 321, 341; Peggy Ann Bliss, *French Revolution's Bicentennial Group Set,* S.J. Star, April 17, 1988, at 35 (Interamerican University law professor Antonio Fernos López states that the Napoleonic Code had more influence than the Spanish Code. on Puerto Rico's Civil Code). And of course, Louisiana shares with Puerto Rico the integration within the federal law system and economic, political, and cultural ties to the United States. The law, cases, and commentary of Louisiana, therefore, provide a natural and logical source of law that should be more frequently visited in addressing civil-law issues in Puerto Rico.[8] Surprisingly, there is a resounding absence of reference to said jurisdiction in the jurisprudence of Puerto Rico. The failure to rely on Louisiana law shows that the purist stance of utilizing only civil law is a manner by which to shun all State-side law, whether common law or civil law, at the expense of sacrificing relevant, well-reasoned, abundant, and just law.[9]

### c. Shared Judicial Structure

Further evidence of the intertwining of Puerto Rico and the United States is shown by the paralleling of Puerto Rico's judicial structure to the American framework. Civilian law is premised on the deemphasis of case law and the inapplicability of *stare decisis.* However, the Judiciary Act sets up a hierarchical court system that mimics the American court system and bears no resemblance to that of Spain. P.R.Laws Ann. tit. 4 (1978); Rivé Rivera, *supra,* at 134. As such, the courts are designed in a pyramid fashion where the Supreme Court of Puerto Rico may overturn the lower courts' decisions.[10] Accordingly, said lower courts abide by the rulings of the Supreme Court, in order to both avoid reversal and in deference to the Court's learned interpretation. Said hierarchical structure makes the principle of *stare decisis* integral to the law of Puerto Rico.

### d. Shared Socioeconomic Structure

Additionally, the ability to utilize common law benefits Puerto Rico law due to the shared socioeconomic structures between the two societies. The Civil Code addresses those issues central to an agrarian rather than an industrial society.

> Romantic as working with the Civil Code may be, the clock cannot be turned back. It must be kept in mind that the application of Spanish law to problems arising from basic socioeconomic structures, such as highways, automobile transportation, medical practice, and modern finance, which operate under standards stemming from federal or American law is consistent with neither practical reality and efficiency nor the sources of law actually being applied in Puerto Rico today.

*Diaz Irizarry v. Ennia, N.V.,* 678 F.Supp. 957, 962 n. 5 (D.P.R.1988) (citation omitted). Therefore, the modern structure of Puerto Rico's society warrants the interaction of both common and civil law in deciding specific cases and controversies.

### e. Shared Legal Training and Education

Finally, the common law is integrated into the Puerto Rico legal education. In the uni-

---

8. For the application of Louisiana law to that of Puerto Rico *see Richmond Steel, Inc. v. Legal Gen'l Assurance Soc'y,* 825 F.Supp. 443, 446 n. 7 (D.P.R.1993) (treatises and case law on Louisiana's Civil Code are helpful in deciding unresolved issues of Puerto Rico's Civil Code due to the two codes' shared origins); *F.D.I.C. v. Consolidated Mortg. and Fin. Corp.,* 691 F.Supp. 557, 565 n. 7 (D.P.R.1988) (referring to an article in the Louisiana Civil Code when the Puerto Rico Civil Code was silent).

9. *See Diaz Irizarry v. Ennia, N.V.,* 678 F.Supp. 957, 962 n. 5 (D.P.R.1988) ("With all due deference we question the wisdom of [the *Valle* ] pronouncement, predicated chiefly on historical and at times emotional considerations."). *But see* José Trías Monge, *El Choque de Dos Culturas Juridicas en Puerto Rico* 398–400 (1991).

10. Puerto Rico Supreme Court rulings are subject to review by the United States Supreme Court. 28 U.S.C. § 1258.

versities,[11] law professors utilize the case method, which is a teaching method focusing on cases to teach legal principles, reasoning, and decisions. The method necessarily involves the reliance upon *stare decisis* to enable students' understanding of a substantive area of law through the presentation of cases in sequential order.

Further, because the Puerto Rico legal education is so closely linked to common-law methodology, once graduated from law school, lawyers continue to rely on case law to substantiate their position. Said reliance is perpetuated by the ease in obtaining and the sheer volume of Anglo–American case law. Lawyers' usage of case law is also reinforced by the difficulty in finding and the scantiness of scholarly articles, which are used to interpret the Civil Code.[12]

### 4. Conclusion

Because the fear of common-law methodology and structure seeping into civil-law jurisdictions is anachronistic in our modern day society, the *Valle* Court's strict approach to methodology hinders the pursuit of justice in Puerto Rico. As discussed above, in refusing to permit references to common law, except as a point of reference for comparative law, the court denies the reality of civil-law's reliance on case law, the inevitable usage of common law in a mixed-law jurisdiction, such as Puerto Rico's, and the shared customs and legal approaches between Puerto Rico and the United States. The words of one civil-law scholar speak to the state of affairs resulting from the *Valle* decision. "[W]e are often much more preoccupied with determining whether or not the solution given to a problem is one of common law or of civil law, rather than asking ourselves whether or not the style laid down is sociologically sound and fits into the general pattern of the legal system as a whole." Baudouin, *supra*, at 3.

Law must reflect reality. Accordingly, this Court sees no reason to preclude the best and most just decision even if it results in the combined utilization of civil-law and common-law techniques. As discussed above, precedent is an important source of law in a civil-law jurisdiction. Therefore, *Valle*'s near banishment of common-law principles seems contrary to the methodology of civil law. Further, common law must be able to be incorporated in civil-law cases for it is the root of the predominant methodological, legal and judicial systems in Puerto Rico. The common law offers guidance to legal application to such a wide range of situations and legal areas that to cabin it in and restrict its usage results in an impractical and quixotic legal system.

The Civil Code in Puerto Rico cannot operate as if it is not surrounded within Puerto Rico and within our nation by laws of common-law origin. Likewise, the courts may not approach law in a struthious manner ignoring the reality of the common law's pervasiveness and applicability. The reality of our law and our Puerto Rican society is that they result from the symbiosis of the civil law and the common law.

The incorporation of the common law into the civil law ensures just decisionmaking in a mixed-law jurisdiction. In Puerto Rico, this process emerges as "Derecho Puertorriqueño." Derecho Puertorriqueño does not mean the banishment of the civil law, but rather the enriching of the civil law with the common law in those areas where the civil law does not provide an answer. Derecho Puertorriqueño involves the absorbing of the common law into the civil law in order to create a better body of law. Accordingly, Derecho Puertorriqueño would highlight, rather than deemphasize and gloss over, the two important legal fonts of our mixed-law jurisdiction: the civil law and the common law.[13]

■■ Turning to the case at hand, the Civil Code does address fault or negligence.

---

**11.** It should also be noted that said universities are accredited by the American Bar Association. Therefore, in order to gain accreditation, they have to meet the standards expected of law schools training common-law, rather than civil-law, lawyers.

**12.** In Louisiana, lawyers utilize the common-law method for similar reasons. Dainow, *supra*, at 324.

**13.** "[I]t seems more accurate to describe Puerto Rico not as a civil law jurisdiction but rather as a jurisdiction where the Civil Code applies." *Diaz Irizarry*, 678 F.Supp. at 962 n. 5.

P.R.Laws Ann. tit. 31, §§ 5141, 5142 (1991), P.R.Civ.Code arts. 1802, 1803 (1930). Under section 5141, "A person who by act or omission causes damage to another through fault or negligence shall be obliged to repair the damages so done." And under section 5142, "[t]he obligation imposed by section 5141 of this title is demandable not only for personal acts and omissions, but also for those of the persons for whom they should be responsible." Further, under Puerto Rico law, a principal is liable for an agent's negligence, but is only sometimes liable for the actions of a principal's independent contractor. *See, e.g., Martinez v. Chase Manhattan Bank*, 108 Off.Transl. 542 (1979); *Lopez v. Cruz Ruiz*, 92 J.T.S. 130 (1992). A vendor is not liable for the negligence of a purchaser, however, as there is not a relationship of responsibility between the two. *See* P.R.Laws Ann. tit. 31, § 5142.

█ Here, neither party argues that Antonio is an agent of Flav–O–Rich. The issue is whether Antonio is an independent contractor, and therefore Flav–O–Rich might be liable for the actions of Antonio's brother Angel under section 5142; or whether Antonio is solely a purchaser, and therefore Flav–O–Rich as a vendor is not liable. The Code does not identify which relationships are independent contractor-principal relationships and which are vendor-purchaser relationships. The distinction between the two relationships, however, is the main issue before the Court as it will determine Flav–O–Rich's liability for the actions of Antonio's brother, Angel. Because the Civil Code is silent on this issue, the Court shall apply "Derecho Puertorriqueño" and turn to the case law of Puerto Rico, Restatement of Agency and other jurisdictions' case law in order to determine whether Antonio is an independent contractor or simply a purchaser of Flav–O–Rich's products.

### B. Puerto Rico Case Law

Two landmark cases, *Martinez* and *Lopez*, involving the issue of whether a principal can be held liable for the negligence of an independent contractor, help clarify who is an independent contractor. In *Martinez*, defendant bank contracted with a collection agency who subcontracted with an independent contractor to repossess a vehicle. Said independent contractor would be paid upon said repossession. In *Cruz*, defendant Municipality of Catañio retained the services of Bayamon Asphalt Paving who subcontracted with codefendant Jesus Cruz Ruiz to clear a vacant lot. In both cases the principal contracted with another to perform a task—repossession and clearing of a vacant lot respectively.

It is clear from Puerto Rico law that Antonio's relationship with Flav–O–Rich does not rise to the level of an independent contractor and its principal as said relationship bears no similarity to that between the principals and independent contractors in *Martinez* and *Cruz*. In the situation at hand, Flav–O–Rich has not in any way contracted with Antonio to perform the task of selling their ice cream. Antonio merely buys defendant's products; Antonio may or may not choose to sell enough ice cream to receive the 25% discount from Flav–O–Rich. Flav–O–Rich has absolutely no control over Antonio, over the way in which he sells their products, or whether or not he even sells their products. Accordingly, Antonio is not an independent contractor, but rather a purchaser of Flav–O–Rich's products.

### C. Restatement

Under the Restatement (Second) of Agency, an independent contractor is "a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." Restatement (Second) of Agency § 2 cmt. b (1957). In the situation at hand, Antonio does not have a contract or an agreement with Flav–O–Rich to sell its products. In fact, Antonio does not exclusively sell Flav–O–Rich's products, but also sells other types of frozen desserts and snacks. Flav–O–Rich does not have a contract with Antonio to serve as a distributor of their products. Antonio does have an identification number that permits him to purchase products at a discount when he buys more than $2,500 in Flav–O–Rich products. But this system does not constitute a contract for Antonio to sell $2,500 worth of products a month. Rather,

only Antonio controls the amount of Flav–O–Rich products he will sell monthly. Accordingly, under the Restatement definition of "independent contractor," Antonio is not an independent contractor of Flav–O–Rich.

### D. Other Jurisdictions' Laws

The Louisiana state courts have offered examples in order to distinguish an independent contractor-principal relationship from that of a vendor-purchaser. A vendor-purchaser relationship rather than a principal-independent contractor relationship exists in the situation where X purchases timber from the landowner, and then cuts and hauls the logs to the mill for sale to Y. *Taylor v. Employer's Mut. Liab. Ins. Co.*, 220 La. 995, 58 So.2d 206 (1952). But where X hauled cotton to Y in order that Y ginned, pressed and baled the cotton, and where X was paid for the amount of bales hauled, X was determined to be an independent contractor for Y. *Sam v. Deville Gin, Inc.*, 143 So.2d 838 (La. Ap.1962). X was not selling the cotton to Y, therefore there was no vendor-purchaser relationship. *Id.* at 840.

In the situation at hand, Antonio's only contact with Flav–O–Rich is to purchase the ice cream products that Flav–O–Rich sells. Flav–O–Rich has no control over the manner, means, or results of Antonio's work. As stated earlier, it is true that Antonio receives a discount of 25% from Flav–O–Rich based on the amount of his purchases. Said discount, however, does not equal control over the results of Antonio's work as Flav–O–Rich does not order Antonio or make an agreement with him to maximize his sales. Therefore, following the distinctions offered by Louisiana law, this Court finds that Antonio is only a purchaser of Flav–O–Rich's products and has no principal-independent contractor relationship with defendant.

The case law of the D.C. Court of Appeals also provides assistance in defining the relationship between Flav–O–Rich and Antonio. In *Wilson v. Good Humor Corp.*, 757 F.2d 1293 (D.C.Cir.1985), plaintiffs brought suit against the ice cream company for the wrongful death of a young girl who was running to the ice cream truck when another car hit and killed her. Although the ice cream truck driver was not on the company payroll, he had entered into a "vendor's agreement" which allowed him to buy the company's ice cream products wholesale and sell it from the truck. And even though he could sell the ice cream at any price and at any location, he could not sell any other ice cream without Good Humor's permission. And the truck driver had agreed that he would devote his efforts to maximizing the sale of his products that he purchased from Good Humor and that he would maintain high hygiene standards. Also, the ice cream truck driver had "purchased" his truck from the ice cream company with financial assistance from the company. On the basis of these facts, the Court of Appeals for the D.C. Circuit held that the ice cream truck driver was an independent contractor of the ice cream company. *Wilson*, 757 F.2d at 1296.

Comparing *Wilson* to the situation at hand, the Court finds that Antonio does not have the links to Flav–O–Rich that the driver had to Good Humor in *Wilson*. First, there is no "vendor's agreement" between Antonio and Flav–O–Rich. Second, Antonio owns his own van, purchased from a third party. Third, Flav–O–Rich does not in any way demand Antonio to meet certain hygiene standards or agree to maximize his sales of the Flav–O–Rich product and in fact Antonio may sell other products. Accordingly, the Court finds that Antonio is not an independent contractor of Flav–O–Rich, but merely a purchaser of Flav–O–Rich's products.

**WHEREFORE,** as plaintiffs premise their tort claim against Flav–O–Rich solely on its responsibility for the action of Antonio's brother Angel, but having decided that Antonio is not an independent contractor of Flav–O–Rich and therefore Flav–O–Rich is not responsible for the actions of Antonio, the Court shall **grant** Flav–O–Rich's motion for summary judgment and **dismiss** the complaint. Judgment shall be entered accordingly.

IT IS SO ORDERED.