**METLIFE CAPITAL CORPORATION, Plaintiff,**

v.

**WESTCHESTER FIRE INSURANCE CO., Defendant.**

**No. CIV,97–2615 HL.**

United States District Court, D. Puerto Rico.

Aug. 30, 2002.

Heidi S. Downey, Blogle & Gates, Seattle, WA, John W. Fried, John P. Winsbro, Joan L. Lewis, Fried & Epstein, New York City, Michael Mirande, Delbert D. Miller, Miller Bateman LLP, Seattle, WA, Antonio M. Bird, Jr., Rosanna Bayonet-Tartak, Bird, Bird & Hestres, Old San Juan, PR, Lee Epstein, Fried & Epstein LLP, Philadelphia, PA, for Metlife Capital Corp.

Jonathan Rogin, John M. Woods, Cliona A. Jennings, Joseph G. Grassso, Thacher, Proffitt & Wood, New York City, Keith A. Graffam, Graffam & Biaggi, San Juan, PR, for Water Quality Ins. Syndicate.

Dario Rivera-Carrasquillo, San Juan, PR, for American Home Ins. Co.

Thomas M. Rittweger, Nicoletti Horning & Sweeney, New York City, Harry A.

Ezratty, San Juan, PR, for Continental Ins. Co., Ins. Co. of North America, Royal Ins. Co. of America.

Juan A. Ramos-Diaz, San Juan, PR, David R. Hornig, Nooshin Namazi, Nicoletti, Horning & Sweeney, New York City, Michael T. Walsh, Christopher P. Foley, Peterson & Ross, New York City, for Reliance Ins. Co.

Francisco J. Amundaray-Rodriguez, Mercado & Soto, San Juna, PR, for Global Ins. Co., S.A., Utica Mutual Ins. Co., American Home Assurance, Reliance Nat'l Ins., Traveler's Indemnity Co., Westchester Fire Ins. Co.

Eric Perez-Ochoa, O'Neill Fernandez Gimore, San Juan, PR, John A. Nadas, Mark D. Cahill, Joshua A. Engel, Carlos J. Perez-Albuerne, Boston, MA, Alfredo Castellanos-Bayouth, Castellanos Law Firm, P.S.C., Rio Piedras, PR, for Traveler's Indemnity Co.

Sherri N. Robinson, James J. Duggan, David Weinberger, Lustig & Brown, New York City, Francisco J. Colon-Pagan, Francisco E. Colon-Ramirez, Colon, Colon & MArtinez, San Juan, PR, for Westchester Fire Ins. Co.

## OPINION AND ORDER

LAFFITTE, Chief Judge.

Plaintiff Metlife Capital Corporation[1] ("MCC") brings suit against its excess liability insurer Westchester Fire Insurance Company's ("Westchester") for breach of an insurance contract. The parties agree that in this admiralty and diversity action, the law of Puerto Rico is applicable to the controversies presented. See *United States Fire Ins. Co. v. Producciones Padosa, Inc.*, 835 F.2d 950, 953 (1st Cir.1987) (taking into account both *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and the parties' concession as to applying Puerto Rico law to the insurance dispute).

As this Court has previously observed, there is a dearth of Puerto Rico law on the precise issues of insurance law presented in this dispute. *Metlife Cap. Corp. v. Water Quality Ins. Syndicate*, 100 F.Supp.2d 90 (D.P.R.2000) (quoting *United States Fire Ins.*, 835 F.2d at 953, as saying that "although the central dispute in this case arises from an insurance policy, the Insurance Code of Puerto Rico seems to us to shed precious little light on the question [presented here]"). In the absence of applicable Puerto Rico law, "the practice of the Puerto Rico Supreme Court 'has been to use the most advanced rules in North American law and civil law....'" *Event Producers, Inc. v. Tyser & Co.*, 854 F.Supp. 35, 38 (D.P.R.1993) (citing *Municipality of San Juan v. Great American Ins. Co.*, 813 F.2d 520, 523 (1st Cir.1987)), *aff'd*, 37 F.3d 1484 (1st Cir.1994); *see also, San Juan v. Great American Ins. Co.*, 117 D.P.R. 632, 636 (1986).[2]

After several years of litigation, the Court held a four day bench trial that commenced July 10, 2002, to resolve the remaining issues in dispute. After considering the evidence presented, the Court is now prepared to rule.

## FINDINGS OF FACT

Based on all the evidence and testimony presented at trial, as well as the parties'

---

1. Subsequent to the commencement of this action, MCC was sold to General Electric Capital Corporation and was renamed "General Electric Business Asset Funding Corporation." Dkt. # 271. However, for the purpose of this Opinion and Order, the Court will continue to refer to plaintiff as MCC.

2. For those with a penchant for the interaction between civil and North America law in this mixed-law jurisdiction, see *Matos–Rivera v. Flav–O–Rich*, 876 F.Supp. 373, 376–77 (D.P.R.1995).

stipulations in the pretrial order, the Court makes the following findings of fact:

1. On January 7, 1994, the tug *M/V Emily S* ("*Emily S*") was towing the barge *T/B Morris J. Berman* ("*Berman*") out of the port of San Juan when the tow line between the two snapped. The rupturing of the tow line allowed the *Berman* to go adrift until it ran aground on a reef 100 yards off of Punta Escambron causing the vessel to discharge 750,000 gallons of fuel oil into the waters of the Commonwealth of Puerto Rico.[3]

2. The *Berman's* collision caused structural, non-pollution related damage to the reef.[4]

3. At the time of the grounding, the *Emily S* was owned by MCC, but was being operated by the Bunker Group, Inc. ("Bunker"), and New England Marine Services, Inc. ("New England Marine") pursuant to a Bareboat Charter Agreement ("Charter").[5]

4. In response to damage caused by the grounding and resulting oil spill, several lawsuits were filed including actions by the Commonwealth of Puerto Rico and the United States ("the governments") seeking recovery for all oil related damages as well as the property damage to the reef for an amount in excess of one-hundred million dollars ($100,000,000).[6] That litigation (the "underlying litigation") sets the backdrop for the instant action.

5. Pursuant to § 11.1 of the Charter, Bunker and New England Marine were required to keep the *Emily S* insured against marine and indemnity risks with liability policies of at least $10,000,000 that would cover among other things property damage, personal injury and death, and pollution liability.[7]

6. At the time of the accident, MCC was covered under a general liability policy issued by the Travelers Indemnity Company ("Travelers") under which Travelers was obligated to defend and indemnify MCC for all sums MCC would be obligated to pay up to a per occurrence limit of one million dollars ($1,000,000) for all non-pollution related property damage. MCC was also insured under a commercial umbrella policy ("the Defender") issued by Westchester for up to ten million dollars ($10,000,000) for each occurrence in excess of the Travelers' one million dollar policy limit. In terms of coverage for pollution damage, MCC was an additional insured under a marine pollution liability policy issued by the Water Quality Insurance Syndicate ("WQIS") that protected MCC for up to five million dollars ($5,000,000) for the unintentional discharge of petroleum products.[8]

7. After the accident, MCC provided timely notice tendering its defense to WQIS, Travelers, and Westchester.[9] Initially, WQIS accepted MCC's defense, but it later refused to pay the legal expenses MCC incurred in defending the underlying litigation.[10] Travelers and Westchester

---

**3.** Dkt. # 271.

**4.** Dr. Vance Vicente Testimony, Tr. Day 1, Tr. pg. 136–38, Dkt. # 281.

**5.** Dkt. # 271; Bareboat Charter Agreement, Trial exh. VII. For all intensive purposes, the Bareboat Charter Agreement is nothing more than a lease agreement.

**6.** Trial exhs. XI, XX, XXIII, XXIV.

**7.** Trial exh. VII.

**8.** The Travelers' policy, Trial exh. II; the Defender, Trial exh. III; and the WQIS policy, Trial exh. I.

**9.** Trial exh. X, XIII, XV, XVI, XVII, 26.

**10.** *Metlife Cap. Corp., v. Water Quality Ins. Syndicate,* 100 F.Supp.2d 90, 94 (D.P.R.2000) (C.J.Laffitte).

both denied owing MCC a duty to defend or indemnify.[11]

8. On November 7, 1997, MCC filed the instant action against WQIS, among others, for breach of contract seeking a declaratory judgment and the recovery of the defense costs incurred in the underlying litigation, plus all future reasonable investigation and defense costs, and for indemnity under the policy.[12]

9. In June of 1999, MCC filed its First Amended Complaint asserting claims directly against Travelers and Westchester claiming that both insurers breached their duty to defend and indemnify.[13]

10. At the time of the filing of this action, neither the limits of liability for the WQIS or Travelers policies had been exhausted.[14]

11. On May 26, 2000, this Court granted summary judgment in favor of MCC, and found that WQIS was liable for the reasonable legal expenses MCC had incurred in connection with its defense in the underlying litigation.[15] Subsequent to this decision, MCC and WQIS reached a settlement over the disputed legal expenses.[16]

12. On December 29, 2000, MCC reached a settlement with the governments of the Commonwealth of Puerto Rico and the United States in the amount of sixty-two million dollars ($62,000,000) plus interest for all claims raised in the underlying litigation.[17]

13. Pursuant to the settlement reached between MCC and the governments, WQIS tendered its full policy limits of five-million dollars ($5,000,000).[18]

14. Prior to the bench trial, MCC and Travelers reached a settlement for one million four-hundred thousand dollars ($1,400,000).[19] This settlement exhausted the per occurrence limit provided under the Travelers policy plus provided for legal costs.

## DISCUSSION

The crux of the present dispute revolves around the interpretation of several clauses of both the Defender and the Travelers' policy. In essence, MCC claims that Westchester, pursuant to the terms of the Defender, must reimburse MCC for the actual costs not already covered by other insurers that it incurred in defending the underlying litigation. MCC further contends that Westchester is responsible for indemnifying MCC for the sum that it has paid and will have to pay for the non-pollution related property damage caused to the reef. Westchester, on the other hand, asserts that MCC is not entitled to any coverage under the provisions of the Defender. Specifically, Westchester argues that as the excess insurer, its policy was never triggered inasmuch as coverage was precluded by a watercraft exclusion listed in the Travelers' policy. Westchester also argues that its duties to defend and indemnify have not attached since MCC has failed to exhaust all underlying insurance.

11. Tr. exh. 13, 17, 20.

12. Dkt. # 271.

13. Dkt. # 271.

14. Dkt. # 271.

15. 100 F.Supp.2d 90, 99 (D.P.R.2000).

16. Dkt. # 271.

17. Dkt. # 255; Michael Mirande testimony, Trial Tr., Day 4, pg. 24, Dkt. # 280; Trial exh. XXXIV.

18. Trial exh. XXXIV.

19. Dkt. # 271.

Under the Puerto Rico Insurance Code, an insurance contract is "construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached ... to the policy." 26 L.P.R.A. § 1125; *PFZ Properties, Inc. v. General Accident Ins. Co.*, 136 D.P.R. 881, 902 (1994).[20] When engaging in contract interpretation, contract clauses and provisions should be read in relation to one another, giving to those that are unclear the meaning which arises from considering all the clauses together. 31 L.P.R.A. § 3475. Terms should be assigned their common meanings, and any term having multiple meanings should be read in the sense that is most suitable to give it effect. 31 L.P.R.A. 3474.

As a general rule, insurance contracts are considered contracts of adhesion that are liberally interpreted in favor of the insured. *Quiñones Lopez v. Manzano Pozas*, 141 D.P.R. 139, 155 (1996); *Rosario v. Atl. Southern Ins. Co.*, 95 D.P.R. 759 (1968). Moreover, exclusion clauses should be interpreted restrictively in order to comply with the policy's intent, that is to provide protection to the insured. *Guerrido Garcia v. U.C.B.*, 143 D.P.R. 337, 348 (1997). Ambiguities should, therefore, be resolved in the manner least favorable to the insurer. *Id.; PFZ Properties*, 136 D.P.R. at 903. However, this praxis does not compel or require courts to interpret a clear, unambiguous clause that favors the insurer in a manner that would benefit the insured. *Quiñones Lopez*, 141 D.P.R. at

155; *Gonzalez v. Coop. Seguros de Vida de P.R.*, 117 D.P.R. 659 (1986).

In sum, under Puerto Rico law, when the terms, conditions, and exclusions listed in a policy are clear and give no margin for ambiguities or differences in interpretation, they must be enforced in accordance with the will of the parties. *Quiñones Lopez*, 141 D.P.R. at 156. Absent an ambiguity, the contract terms are binding on the parties. *Garcia Curbelo v. A.F.F.*, 127 D.P.R. 747 (1991).

Aside from the foregoing general interpretative principles, it is also necessary to discuss the meaning and purpose of the different insurance policies at issue. Knowledge and understanding of the distinctions between primary and excess coverage will prove helpful in examining the interpretive issues before the Court. Primary insurance is that which provides the insured's initial layer of protection against liability and loss, and its premiums are commensurate with the high degree of risk that the insurance covers. *American Special Risk Ins. Co. v. A–Best Products, Inc.*, 975 F.Supp. 1019, 1022 (N.D.Ohio 1997). Excess or secondary coverage is coverage whereby, in accordance with the terms of the policy, liability attaches only after the policy limits of the primary coverage have been exhausted. *Id.*

Insurers providing excess coverage may offer "umbrella policies" that differ from standard excess policies "in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary

---

20. In this Opinion and Order, the Court relies on several Puerto Rico Supreme Court decisions cited by the parties. Unfortunately, the official English translations are not yet available for many of these cases. As such, the Court would like to remind the parties that if an appeal is taken, the parties will be responsible for submitting the English translations of these cases to the First Circuit. *U.S. v. Rivera–Rosario*, 300 F.3d 1 (1st Cir.2002) (warning that documents not submitted with English translations will not be considered); *see also Ramos–Baez v. Bossolo–Lopez*, 240 F.3d 92, 93–94 (1st Cir.2001) (the circuit court will not consider untranslated documents pursuant to 1st Cir.R. 30.7).

coverage)." *Commercial Union Ins. v. Walbrook Ins. Co.,* 7 F.3d 1047, 1053 (1st Cir.1993). The vertical coverage provides additional coverage above the limits covered by all underlying insurance, whereas the horizontal coverage serves as a gap filler that "drops down" to provide primary coverage for situations or occurrence not covered at all by the underlying insurance. *American Special Risk Ins. Co.,* 975 F.Supp. at 1022.

With this framework in place, the Court turns to the disputed issues and will address each in turn.

*I. Watercraft Limitation:*

Westchester first argues that under the Defender's watercraft limitation endorsement, MCC is not entitled to any coverage. Said endorsement reads in relevant part that:

> WITH RESPECT TO ..., "PROPERTY DAMAGE," ... ARISING OUT OF OWNERSHIP, MAINTENANCE, OPERATION, USE, LOADING OR UNLOADING OF ANY WATERCRAFT, THIS POLICY IS LIMITED TO THE COVERAGE PROVIDED IN THE "UNDERLYING INSURANCE."

> IF COVERAGE IS NOT PROVIDED BY "UNDERLYING INSURANCE," COVERAGE IS EXCLUDED FROM THIS POLICY.[21]

From this language, it is clear that coverage for watercraft liability under the Defender is offered under the same terms afforded by the underlying Travelers policy. Hence, in order to better understand Westchester's obligations, the Court must examine the terms of the Travelers' policy as they relate to watercraft.

Within the Travelers policy, there is included a watercraft exclusion. Said exclusion provides, in relevant part, that:

> THIS INSURANCE DOES NOT APPLY TO

> G. "BODILY INJURY" OR "PROPERTY DAMAGE" ARISING OUT OF THE OWNERSHIP, MAINTENANCE, USE OR ENTRUSTMENT TO OTHERS OF ... WATERCRAFT OWNED OR OPERATED BY OR RENTED OR LOANED TO ANY INSURED ...

> THIS EXCLUSION DOES NOT APPLY TO:

>> (6) WATERCRAFT OWNED BY THE NAME INSURED AND LEASED TO OTHERS.

>> COVERAGE APPLIES SUBJECT TO THE FOLLOWING PROVISIONS:

>> A. AT THE TIMES OF THE OCCURRENCE, THE INSURANCE REQUIRED BY LEASE AGREEMENT IS NOT COLLECTIBLE.

>> B. THE INSURANCE PROVIDED IS EXCESS OVER ANY COLLECTIBLE INSURANCE, WHETHER PRIMARY, EXCESS OR CONTINGENT.[22]

Citing this provision, Westchester argues that because coverage did not exist under the Travelers policy, the defense and indemnity provisions of the Defender were never triggered.

In its argument, Westchester does not dispute that MCC owned the *Emily S,* and had leased it to others. Rather, Westchester contends that MCC failed to exhaust the insurance policy it had required Bunker and New England Marine to procure as a condition of the lease agreement. Ac-

---

**21.** Trial exh. V., Watercraft Limitation, endorsement no. 9.

**22.** Trial exh. III.

cording to Westchester, Bunker and New England Marine were insured, as required by the Charter, under a protection and indemnity policy for the *Emily S* issued by the Global Insurance Company ("Global"). Westchester claims that although MCC, as the owner of the *Emily S*, was a named assured under the Global policy, it never filed a claim with Global. Westchester avers that MCC's failure to exhaust this policy precludes it from seeking recovery under the Defender. In response, MCC asserts that no such policy exists and therefore it could not have filed a claim. As evidence of this averment, MCC points to the fact that no one has been able to locate a copy of the alleged Global policy. The question as to whether Westchester can rely on the alleged existence of the Global policy, and deny coverage on that basis, is a central and highly contested issue that will directly impact the outcome of this case. As such, the Court will address it at this time.

### A.

■ A party relying on the terms of a missing insurance policy must first certify to the Court that it has made a diligent and unsuccessful search for the policy. 17 COUCH ON INSURANCE § 254.28 (3rd ed.2000); *State of N.Y. v. Blank,* 820 F.Supp. 697 (N.D.N.Y.1993), vacated on other grounds, 27 F.3d 783 (2d Cir.1994). Once this threshold is met, the proponent of the missing policy bears the heavy burden of establishing the existence as well as the terms and conditions of the policy by clear and convincing, or at least, strong and conclusive evidence. *See e.g., Emons Industries, Inc. v. Liberty Mut. Fire Ins. Co.,* 545 F.Supp. 185 (S.D.N.Y.1982); *Boyce Thompson Institute for Plant Research, Inc. v. Insurance Co. Of North America,* 751 F.Supp. 1137 (S.D.N.Y.1990); *Chicago, Wilmington & Franklin Coal Co. v. Menhall,* 131 F.2d 117 (7th Cir.1942); 2

BARRY OSTRAGER & THOMAS R. NEWMAN, HANDBOOK ON INSURANCE COVERAGE DISPUTES § 17.03 (11th ed.2002); *But see, Servants of Paraclete, Inc. v. Great American Ins. Co.,* 857 F.Supp. 822 (D.N.M.1994) (applying preponderance of evidence standard); *Americhem Corp. v. St. Paul Fire and Marine Ins. Co.,* 942 F.Supp. 1143 (W.D.Mich.1995) (same).

■ To indirectly prove the contents of a lost policy, a party can present secondary evidence as probative of coverage. OSTRAGER & NEWMAN, *supra,* § 17.04; FED. R.EVID. 1004 (other evidence of the contents of a writing is admissible if the original is lost or destroyed). Such secondary evidence may include testimony by a witnesses having familiarity with the terms of the original document. *See e.g., Sanstorm Inc. v. Hartford Accident & Indemnity Co.,* 940 F.2d 1535 (9th Cir.1991) (unpublished opinion) (witness' testimony on the contents of the policy must be based on "direct recollection" in order to be probative). Documentary proof is also helpful and can include correspondence, financial statements, annual reports, certificates of insurance, and records of premium payments. OSTRAGER & NEWMAN, *supra,* § 17.04.

■ However, the mention of a policy number in another document is insufficient to establish either the existence or the terms of insurance coverage. *Boyce Thompson,* 751 F.Supp. at 1140 n. 2. Mere surmise, conjecture, or speculation about the contents of a policy will also not be sufficient, particularly when the lost writing is central to the "very foundation of the claim." *Sylvania Elec. Prods., Inc. v. Flanagan* 352 F.2d 1005, 1008 (1st Cir. 1965). In such an instance, "more strictness in proof is required than where the writings are only involved collaterally." *Id.; See also, Bituminous Casualty Corp.*

*v. Vacuum Tanks,* 975 F.2d 1130, 1132–33 (5th Cir.1992) (applying Texas law) (holding that an insured's proof of policy numbers, dates of coverage and coverage amount was insufficient to establish the actual provisions contained in the lost policy); *Keene Corp. v. Insurance Co. of North America,* 513 F.Supp. 47 (D.D.C. 1981) (insured's evidence of specimen form policies, policy numbers, and coverage dates was insufficient to sustain insured's burden of proving coverage by clear and convincing evidence); *United States Fidelity & Guaranty Co. v. Thomas Solvent Co.,* 683 F.Supp. 1139 (W.D.Mich.1988) (insured failed to adduce sufficient evidence establishing the specific provisions and terms of the missing policy).

■ Here, Westchester as the proponent of the missing Global policy bears the burden of establishing not only its existence, but also its terms and provisions by clear and convincing evidence. As a preliminary matter, the Court notes that Westchester has made no attempt to detail any steps taken to find the missing policy, and has thus failed to make any showing of a diligent search. Nevertheless, Westchester highlights several pieces of documentary evidence in support of its argument that the Global policy was available. Specifically, Westchester offers a certificate of insurance and a confirmation of insurance both of which were issued by New England Marine's insurance broker, Windward International, Inc. ("Windward") in response to MCC's request for proof of insurance. The certificate,[23] dated August 13, 1993, lists MCC, Bunker, and New England Marine as being covered under a hull and machinery policy that included protection and indemnity ("P & I") coverage for the *Emily S* underwritten by a company called Eastern Marine Management ("Eastern").[24] Similarly, the confirmation of insurance,[25] reiterates this same information as it relates solely to New England Marine.[26] According to Westchester, Windward was authorized to bind coverage on behalf of Eastern, who in turn was authorized to bind coverage on behalf of Global. Here, Westchester maintains that Windward procured the Global policy on behalf of New England Marine through Eastern.

This explanation, however, does not account for the fact that neither the certificate nor the confirmation mention or refer to a policy issued by Global. In response to this observation, Westchester points to a letter, dated September 16, 1993, sent by Windward Vice President Joseph Cacici to MCC legal representative Jeanne Murphy certifying that the policy listed in the certificate providing for hull and machinery including P & I coverage was indeed issued Global.[27] This evidence, however, taken as a whole, is not sufficient to fulfill Westchester's burden.

At trial, Westchester did not present any witnesses connected to or employed by Global who could have testified as to having direct knowledge concerning the al-

23. Trial exh. 53, attachment.

24. The certificate also lists the limit of coverage as being $1,000,000.00 for protection and indemnity, and the term covered as being June 25, 1993–June 25, 1994.

25. Trial. exh. 53, attachment.

26. The confirmation of insurance lists New England Marine as being covered under a hull and machinery policy underwritten by Eastern for a term spanning June 25, 2993–June 25, 1994. The confirmation also provides some of the terms and conditions relating to the limits under which New England Marine would be covered.

27. Trial exh. J.

leged policy.[28] Moreover, there are several pieces of evidence on record that have caused the Court to question the reliability of any documents issued by Windward. First, aside from the August 13, 1993 certificate, there are two other certificates of insurance in evidence issued by Windward, one issued on December 13, 1993,[29] and another on January 13, 1994[30]. These certificates are noteworthy insofar as the August, 1993, and the December, 1993, certificates identify the hull and machinery coverage policy as being Policy No. W216–93–HM/PI, while the January, 1994, certificate, which was issued six days after the accident, lists the same policy as being Policy No. W188–93–HM/PI.[31] Although the January, 1994, certificate was the last and most recent certificate issued, Cacici in a letter to MCC Vice President Richard Barquist dated February 9, 1994, stated that the appropriate policy number for the hull and machinery was W216–93–HM/PI. These discrepancies in policy numbers lead the Court to believe that either Windward's records are not accurate and reliable, or that the Global policy was never issued.[32]

More troubling to the Court, however, is a letter sent by Peter Frank, president of New England Marine, to Murphy on November 12, 1993, informing her that the *Emily S* would be covered by new underwriters.[33] Attached to the letter is a certificate of insurance listing Royal Insurance Company and Marine Office of America as providing hull and machinery including P & I coverage for the *Emily S*. This is significant inasmuch as Westchester has consistently maintained that New England Marine along with MCC and Bunker were all listed as being insured under the Global policy. Here is evidence directly from New England Marine stating that as of two months prior to the accident, it was not covered by Global.

With this evidence, the Court holds that Westchester has failed to meet its burden of proving the existence of the Global policy by clear and convincing evidence. If anything, the evidence is contradictory and confusing. Aside from the discrepancies in the policy numbers, there is some confusion as to who, if anyone, actually provided P & I coverage for the *Emily S* considering that up to four companies have been mentioned. Considering the importance of this issue, the Court cannot find that the Global policy exists without more consistent, non-contradictory evidence.

Yet, even assuming, *arguendo*, that the Court had found that Global had issued a policy covering the *Emily S* and insuring MCC, Westchester has failed to establish the specific terms and provisions of that policy. Westchester has presented no evi-

---

**28.** While Westchester did submit the deposition transcript of New England President Robert Farulla as evidence of the existence of the Global policy, the Court deemed it inadmissible. Accordingly, the Court did not consider this evidence.

**29.** Trial exh. N.

**30.** Trial exh. R.

**31.** Each certificate expressly states that, "[t]his Certificate shall replace and supersede any previous Certificate issued."

**32.** Further bolstering the Court's lack of confidence in Windward's records, the Court cites to a letter from Cacici to Murphy dated August 20, 1993 wherein Cacici states that the insurance covering New England Marine for hull and machinery including P & I had been issued by Global *and* another company called California Pacific through Eastern. Trial Exh. 53, attachment. There is no further mention of this second insurance company in any other correspondence or certificates of insurance, nor does Westchester explain why Windward lists this company as an insurer.

**33.** Trial exh. 56.

dence delineating the specific language of the alleged Global policy. While the certificates and the confirmation of insurance do outline the type of coverage, the dates of coverage, and coverage amounts, these documents do not specify or describe any specific provisions such as a duty to defend clause, or any exclusions that may be applicable. Absent proof of or reference to the specific language, the Court can make no determinations as to what duties Global may have owed MCC under the policy. With so many uncertainties, the Court is unwilling to interpret a policy whose terms have not been established. Moreover, the Court will not attempt to determine how the unestablished terms of the phantom Global policy might affect Westchester's obligations to MCC within the context of this case.

### B.

Having found there to be insufficient evidence to establish the existence of a policy issued by Global, the Court turns its attention back to the watercraft exclusion. Under the exclusion, no coverage would be afforded so long as the as the insurance required by the lease agreement was collectible. In this case, no such policy has been proven to exist, and therefore, if none existed, none could have been collectible. As such, by the terms of the exclusion, MCC was only required to exhaust the Travelers policy before the provisions of the Defender would be activated. As of this time, Travelers has tendered its policy limits to MCC, and thus the exhaustion requirement has been fulfilled. Accordingly, Westchester cannot rely on the Watercraft Limitation or the watercraft exclusion in order to deny coverage to MCC. The Court now turns to Westchester's other defenses.

### II. Duty to Defend:

As it relates to the duty to defend, the dispute between the parties centers around the interpretation of the specific language within the Defender. On the one hand, MCC contends that under an umbrella policy such as the Defender, Westchester was obligated to assume the role of the primary insurer and provide a defense once Travelers' denied of coverage. Westchester, on the other hand, argues that it had no obligation to drop down, but was rather obligated, as a purely excess insurer, to provide a defense only after the underlying insurance as well as all other applicable insurance had been exhausted.

 The duty of an insurer to provide a defense for claims asserted against its insureds is a contractual one that arises out of the policy, and since the purpose of the policy is to protect the insured, the duty to defend is an essential part of the coverage that is contracted for directly with the insurer. *Pagan Caraballo v. Silva*, 122 D.P.R. 105 (1988); *see also*, OSTRAGER & NEWMAN, *supra*, § 5.01. Defense clauses in policies have two purposes: bind the insurer to assume the insured's defense and provide the rights associated with the defense. *PFZ Properties*, 136 D.P.R. at 893. Accordingly, an insurer's duty to defend is measured by the terms of the policy. *Fernandez v. Royal Indemnity Co.*, 87 D.P.R. 859 (1963); *Gross v. Lloyds of London Ins. Co.*, 121 Wis.2d 78, 358 N.W.2d 266, 270 (1984) (stating that "each case involving a promise to defend must be considered independently on the basis of the particular language in the contract at issue").

 It is generally recognized that an insurer's duty to defend a lawsuit is separate and distinct from the insurer's duty to indemnify the insured for liability imposed after trial. 14 COUCH ON INSURANCE § 200:3 (3rd ed.1999). In addition, it

has been uniformly held that the duty to defend is more extensive and broader than the duty to indemnify. *PFZ Properties,* 136 D.P.R. at 895; *Pagan Caraballo,* 122 D.P.R. at 111–13. That is to say that an insurer will often times to be obligated to defend the insured despite the possibility that it will not have to indemnify. *PFZ Properties,* 136 D.P.R. at 895. The duty to defend arises when the possibility exists, from a liberal interpretation of the pleadings, that the insured is protected by the policy issued, regardless of the final outcome of the case. *Id.* at 896.

In a situation where the insured is covered by both primary and secondary insurance, the primary insurer has the primary duty to defend. 14 COUCH ON INSURANCE § 200:41 (3rd ed.1999). In such a situation, if the claim against the insured is made within the policy limits of the primary policy and the primary insurer undertakes the defense, the secondary insurer is usually not required to defend. *Ceresino v. Fire Ins. Exchange,* 215 Ca. App.3d 814, 264 Cal.Rptr. 30 (4th Dist. 1989). However, in circumstances where the claim against the insured equals an amount exceeding the primary policy limits, the excess insurer's duty to defend may also be triggered. *See e.g., Phico Ins. Co. v. Aetna Casualty & Sur. Co. of Am.,* 93 F.Supp.2d 982, 993–94 (S.D.Ind.2000) (excess insurer owed duty of care to insured once it understood primary limits would be exhausted); *American Motorists Ins. Co. v. Trane Co.,* 544 F.Supp. 669, 692 (W.D.Wis.1982), *aff'd,* 718 F.2d 842 (7th Cir.1983) (stating the "if the claim against the insured exceeds the monetary limits set by the underlying insurer, the excess insurer's duty to defend is usually activated, even if the underlying insurer undertakes the defense as well"); *Millers' Mut. Ins. Ass'n v. Iowa Nat'l Mut. Ins. Co.,* 618 F.Supp. 301, 306 (D.Colo.1985) (stating

that where defense costs could run into the hundreds of thousands of dollars, equity would not permit the excess insurers to reap a windfall by having their defense obligations discharged solely by the primary insurer). When both the primary and excess insurer are obligated to defend, each will be liable for a pro rata share of the costs of the defense based in proportion to the amount of the claim each is required to pay. 14 COUCH ON INSURANCE § 200:41 (3rd ed.1999); *Celina Mutual Ins. Co. v. Citizens Ins. Co.,* 133 Mich.App. 655, 349 N.W.2d 547, 550 (1984) (finding that prorating defense costs among primary and excess insurers, based upon their exposure, "provides no obstacle to an effective defense and leads to a more equitable distribution of the cost of litigation among the insurers"). The obligation for the excess insurer to provide a defense, however, will be dictated and may be limited by the specific terms of the policy.

Here, Westchester's duty to defend arises directly from the Defender, which delineates the precise details of the duty. Under the Defender, Westchester

> (1) ... SHALL HAVE THE RIGHT AND DUTY TO DEFEND ANY "CLAIM" OR "SUIT" SEEKING DAMAGES, EVEN IF THE ALLEGATIONS ARE GROUNDLESS, FALSE OR FRAUDULENT, COVERED BY THE TERMS AND CONDITIONS OF THIS POLICY WHEN:
>
> > (a) THE APPLICABLE LIMITS OF INSURANCE OF THE UNDERLYING INSURANCE POLICIES SET FORTH IN SCHEDULE A AND TO BE MAINTAINED BY YOU ..., PLUS THE APPLICABLE LIMITS OF OTHER INSURANCE HAVE BEEN EXHAUSTED BY PAYMENTS; OR
> >
> > (b) DAMAGES ARE SOUGHT FOR ... "PROPERTY DAMAGE," ...

WHICH ARE NOT COVERED BY "UNDERLYING INSURANCE" OR OTHER INSURANCE.

(4) [WESTCHESTER] WILL NOT BE OBLIGATED TO INVESTIGATE, NEGOTIATE, SETTLE OR DEFEND ANY "CLAIM," "SUIT," OR TRIAL BROUGHT AGAINST, OR APPLICABLE TO, ANY "INSURED" WHEN INSURANCE IS AVAILABLE TO OR COLLECTIBLE BY THE "INSURED" UNDER ANY "UNDERLYING INSURANCE" OR OTHER INSURANCE.

IN THE EVENT THAT:

(A) THE "UNDERLYING INSURANCE" IS NOT AVAILABLE OR COLLECTIBLE BECAUSE OF BANKRUPTCY, INSOLVENCY OR INABILITY OR FAILURE TO COMPLY WITH ANY OF ITS OBLIGATIONS OF THE UNDERLYING INSURER(S) PROVIDING SUCH "UNDERLYING INSURANCE"; ...

OUR OBLIGATION TO INVESTIGATE, NEGOTIATE, SETTLE OR DEFEND ANY "CLAIM," "SUIT," OR TRIAL BROUGHT AGAINST, OR APPLICABLE TO, ANY "INSURED" WILL BE NO DIFFERENT THAN IT WOULD HAVE BEEN IF THE CIRCUMSTANCES DESCRIBED IN (A) ... HAD NOT HAPPENED.

From this language, MCC contends that Travelers' denial of coverage essentially left it as being "not covered" as this phrase is used in subsection 1(b). To that end, MCC argues that Westchester was obligated to drop down, fill the gap left by Travelers, and defend the action as provided by said subsection. Westchester, however, maintains that MCC was indeed covered for property damage by the Travelers policy, regardless of how wrongful Travelers'

denial may have been. Westchester further argues that as the excess insurer, and in accordance with the specific terms of subsection 1(a) and paragraph (4), it was only bound to defend once all underlying insurance plus other insurance had been exhausted. Under these provisions, both parties agree that the WQIS policy qualifies as "other insurance."

The resolution of this dilemma, therefore, will turn on the interpretation this Court assigns to the phrase "not covered." The Fifth Circuit in *American Special Risk Ins. Co. v. A–Best Products, Inc.,* encountered a similar debate over the meaning of the phrase "not covered" in an insurance contract. 792 F.2d at 553. On this question, that court explained it best when it succinctly stated that:

When an excess insurer uses the term "collectible" or "recoverable" it is agreeing to drop down in the event the primary coverage becomes uncollectible or unrecoverable; on the other hand, when an excess insurer uses the term "covered" or "not covered," it is agreeing to drop down only in the event that the terms of the underlying policy do not provide coverage for the occurrence or occurrences in question.

*Id.*

Under this definition, the Court finds MCC's reading, which equates Travelers' denial of coverage as being tantamount to being "not covered," to be unpersuasive. Applying the plain meaning of the phrase "not covered," the Court interprets subsection 1(a) as requiring Westchester to provide vertical coverage once all primary insurance is exhausted. In contrast, Westchester is required, under subsection 1(b), to "drop down" and provide horizontal coverage only when no coverage is provided for the type of occurrence at issue under the primary policy. Since MCC was covered for property damage

under Travelers' policy, Westchester was under no obligation to drop down and provide a defense until all available insurance had first been exhausted. Had Westchester used the term "recoverable" or "collectible" rather than "covered," MCC's argument would have been more persuasive.

For additional support for this holding, the Court need look no further than the very terms of the Defender. Paragraph (4) of the Defender expressly provides for the case where the primary insurer denies coverage. Under said paragraph, the mere fact that the underlying insurer fails to meet its obligation does not affect or alter Westchester's defense obligation in any manner. Travelers' denial of coverage, however wrongful, did not have the effect of leaving MCC "not covered" since its policy did in fact cover property damage. Because MCC was covered by insurance, subsection 1(a) applies, and exhaustion is required.

■ Although the Court has found that Westchester was not required to drop down and defend the underlying litigation in response to Travelers' denial, this determination is as of this point a purely academic holding. By this time, both Travelers and WQIS have tendered their policy limits, and as a result, have exhausted their obligations. There currently being no other available or collectible insurance, Westchester must now fulfill its obligation to pay its pro rata share of the defense costs MCC incurred in defending the underlying litigation.[34]

The fact that it is now liable for defense costs should come as no surprise to Westchester in light of the fact that the initial claims against MCC were for well over

one-hundred million dollars. Given the fact that MCC faced such massive liability and litigation, it is not surprising that its legal defense costs ran into the millions of dollars. As such, Westchester should have expected and known that MCC would inevitably exhaust all its available policy limits, and that it would, as the excess insurer, eventually become liable for its share of the costs. Consistent with the principles of equity, this Court cannot allow Westchester to reap a windfall by avoiding a contractual obligation and risk it assumed.

### III. Indemnification:

■ Finally, MCC claims that Westchester is also responsible for indemnifying it for part of the sum that it has paid to settle those claims related to the damage caused to the reef. In support of this contention, MCC cites the portion of the Defender stating that Westchester:

(1) WILL PAY ON BEHALF OF THE "INSURED" THOSE SUMS IN EXCESS OF THE "RETAINED LIMIT" WHICH THE "INSURED," BY REASON OF LIABILITY IMPOSED BY LAW, ..., SHALL BECOME LEGALLY OBLIGATED TO PAY AS DAMAGES FOR:

(A) "BODILY INJURY" OR "PROPERTY DAMAGE" OCCURRING DURING THE POLICY PERIOD ... AND CAUSED BY AN "OCCURRENCE;"

Property damage is defined as "physical injury to tangible property." [35] Yet, while the Defender provides indemnification for damage caused to such tangible property, that damage is restricted to only non-pol-

---

**34.** Westchester has also argued that the Global policy constitutes other insurance MCC failed to exhaust. The Court has ruled that there is insufficient evidence to prove this policy's existence.

**35.** The Defender, definition J, Trial exh. V.

lution related damage. Under exclusion J, no coverage is afforded to any damage caused by the discharge or escape of pollutants such as oil.

Before proceeding, the Court must first determine whether there is any property damage at issue that would qualify for indemnification under the Defender. On this issue, MCC offered the testimony of Dr. Vance Vicente who at the time of the accident was a fisheries biologist with the National Oceanic and Atmospheric Administration ("NOAA"). Vicente, who testified solely as a factual witness, actually dove and inspected the site on January 27, 1994, twenty days after the accident. From his observations, Vicente testified that the *Berman's* impact with the reef did indeed cause physical and structural damage.[36] Specifically, Vicente described the impact site on the reef as being barren and devoid of any marine life, a condition which is unnatural for a reef.[37] Vicente also testified as having observed large boulders that had been split in half and toppled over so that the coral were facing down rather than up towards the sunlight, as they would have ordinarily been found.[38] As for oil related damage to the reef, Vicente testified that the reef was neither stained with oil nor were the coral bleached, both of which are conditions symptomatic of oil associated damage.[39] In his opinion, the principal damage to the reef was of a physical nature resulting from the collision and not from the oil. Westchester did not present any witnesses to contradict or challenge Vicente's testimony.

From this undisputed testimony, and as a matter of common sense, it is clear that the *Berman's* collision did cause non-oil damage to the reef. The Court does note

that damage caused was limited only to the actual impact site. There was no evidence presented to suggest that the collision caused any significantly extensive damage to the reef. Nevertheless, the extent of the damage is not an issue the Court must resolve at this time. For the purpose of this Opinion and Order, the Court is confining itself only to the issues relating to Westchester's liability for indemnification.

■ Having found there to be property damage, Court turns its attention to the parties' dispute concerning the interpretation of the policy language, and particularly the definition of the phrase "Retained Limit" as it is used in paragraph (1). "Retained Limit," according to the Defender, means whichever of the following is applicable:

(1) WITH RESPECT TO ANY "OCCURRENCE" THAT IS COVERED BY "UNDERLYING INSURANCE" OR ANY OTHER INSURANCE, THE TOTAL OF THE APPLICABLE LIMITS OF THE "UNDERLYING INSURANCE" PLUS THE APPLICABLE LIMITS OF ANY OTHER INSURANCE; OR

(2) WITH RESPECT TO ANY "OCCURRENCE" THAT IS NOT COVERED BY "UNDERLYING INSURANCE" OR ANY OTHER INSURANCE, THE AMOUNT OF THE SELF–INSURED RETENTION STATED IN ITEM 4(e) OF THE DECLARATIONS (THE "SELF–INSURED RETENTION").

To interpret these subsections, the meaning of the phrase "not covered" is once again instrumental. In cases where the insured is "covered" by underlying insur-

---

36. Vicente testimony, Trial Tr. Day 1, pgs. 136–39.

37. Id. at 138.

38. Id. at 137–38.

39. Id. at 135–37.

ance, Westchester, under subsection (1), would not be liable for indemnity until all underlying insurance plus any other available insurance had first been fully exhausted. In such an instance, Westchester would only be liable for an amount above that which is covered by the underlying policy limits. On the other hand, where the insurer is "not covered," subsection (2) requires Westchester to indemnify the insured for an amount in excess of a self insured retention, which as defined by the Defender equals $10,000.00. That is to say that the insured would be responsible for the first $10,000 of any damages caused.

For some unintelligible reason, MCC argues that because it was covered for property damage under the Travelers' policy, but Travelers denied coverage, either or both subsections apply to this case. It is difficult for the Court to understand how both could possible apply inasmuch as either MCC was covered by underlying insurance or it was not. Westchester contends that given that there was coverage, only subsection (1) applies. The Court agrees. Accordingly, MCC's ability to recover from Westchester for indemnity will depend solely on whether it has first exhausted all available insurance.

■ At this point, two significant issues arise. The first concerns Westchester's contention that MCC has yet to exhaust the retained limit as defined under subsection (1).[40] According to Westchester, MCC is currently pursuing recovery for the damages to the reef through a group known as the Cristal Fund, which Westchester argues constitutes "other insurance." The Cristal Fund ("Fund") is a voluntary compensation scheme established by several oil companies to provide compensation to those parties harmed by oil spills. MCC has never made any con-

tributions to the Fund, nor did it have a contract with the Fund prior to the accident. MCC has, however, made a claim against the fund for the amount necessary to restore the reef. The Fund has determined to compensate MCC for an amount not to exceed $5.7 million, but only after the reef is actually rebuilt and restored.

■ Westchester argues that because the Fund has agreed to compensate MCC for the cost of the reef restoration, it has no duty to indemnify since all costs will be covered by underlying or other insurance. In response, MCC argues that the Fund does not qualify as insurance under Puerto Rico law, and as such cannot constitute "other insurance." The Court agrees. Insurance, as defined by the Puerto Rico Insurance Code, "is a contract whereby one undertakes to indemnify another, or to pay or provide a specified or ascertainable benefit upon determinable contingencies therein foreseen." 26 L.P.R.A. § 102. Here, there is no contract to indemnify between the Fund and MCC. Contracts generally require the parties to enter into some form of *quid pro quo* exchange of obligations. Each party's obligation serves as the consideration necessary to support the contract. Claimants to the Fund, however, must fulfill no obligation before making a claim, and therefore must provide no consideration. The Fund simply provides a purely voluntary compensation scheme to which anyone can apply without fulfilling a contractual obligation, and as such, it cannot be considered a contract. Therefore, because the Fund does not qualify as an indemnity contract, it cannot be considered insurance, or more importantly, "other insurance."

While the Court recognizes there may be a risk of double recovery, this risk was

---

**40.** Again, Westchester cited MCC's need to exhaust the Global policy. No such policy

has been proven to exist, and thus exhaustion is not required.

assumed by Westchester. Unfortunately for Westchester, the existence of a compensation scheme such as the Fund is a contingency not contemplated by the Defender. The controlling terms and conditions expressed within the Defender only relieve Westchester of its obligations when there is other available insurance present. Since the Fund does not qualify as "other insurance," its existence is not sufficient to discharge Westchester of its duty to indemnify.

▪ The second issue Westchester identifies relates to the settlement reached between MCC and the governments. According to Westchester, it is unknown how much of $62 million settlement was allocated for non-oil related property damage, and this lack of knowledge poses a major problem for determining what amount, if any, Westchester would need to indemnify MCC. During the trial, MCC introduced evidence that the Commonwealth of Puerto Rico sought $5,715,313 in the underlying litigation for all costs associated with the reef restoration.[41] Westchester argues that it is uncertain how much of this amount was actually extinguished by the settlement figure. According to Westchester's logic, if $61 million was allocated for oil related damage and $1 million was earmarked for non-oil related damage, then Westchester would not be liable inasmuch as Travelers' $1 million policy limits would have covered the damage caused to the reef. At the very least, Westchester argues, the amount for which it is liable cannot be determined absent these allocations.

While Westchester argues a valid point, this lack of information does not discharge

Westchester from its obligation to indemnify. The primary issue before the Court at this time is the question of liability. After reviewing all the evidence and arguments presented, the Court holds that Westchester is liable for breaching its duty to indemnify. The amount for which it is liable, however, is a matter that this Court will address separately.

### Conclusion

The Court thus finds that Westchester is liable to MCC for its pro rata share of MCC's legal expenses incurred defending the underlying litigation. The Court also finds Westchester must indemnify MCC for the reasonable costs associated with the restoration of the reef. If the parties are unable to reach a settlement, the Court will hold a settlement conference with the parties on **September 24, 2002**, at 2:00 p.m., to discuss the damages in this case.

**IT IS SO ORDERED.**

---

**41.** Trial exh. 63. While MCC presented this amount as being an appropriate estimate of what it will take to restore the reef, it has offered no evidence to substantiate how this calculation was derived. The Court is somewhat skeptical that this figure reflects the proper measure of damage given that the damage is limited solely to the impact site, and that the reef possesses self-healing properties. However, this is a concern that will be fully addressed at another time.