STAHL, Circuit Judge,
concurring.
While I join this opinion, I write separately to express my concerns about its potential ramifications. It goes without saying that the typical consumer who purchases excess insurance expects that such insurance will protect him,or her in the event of a catastrophic accident where liability is relatively certain and where a potential judgment will likely exceed the primary coverage. Here, the Underlying Defendants, recognizing the extent'of Sal-vati’s claim, reasonably believed that their primary and excess insurance policies would protect them. Likewise, Salvati, having gained knowledge of the Defendants’ primary and excess coverage, knowledge in part gained through the excess carrier’s presence during the settlement discussions, reasonably believed that the excess policy would cover the amount of the settlement that exceeded the primary policy limit. Notwithstanding that reasonable expectation, we now hold that the documents presented to us on appeal, interpreted with the aid of fragmentary guidance from Massachusetts courts, require us to find that this particular settlement agreement did not trigger an obligation to indemnify under the excess insurance policy. While the opinion’s parsing of the relevant contractual terms is admirable, the end result lays bare several troubling practical consequences that may ultimately decrease the incentives for plaintiffs, defendants, and insurers to settle, which in turn may lead to more trials, higher costs, and less effective excess insurance coverage.[10]
My concerns stem from a hypothetical. Think about a case like this one, only where the settlement discussions occur after this opinion’s release. Given our strict interpretation of the terms of the Settlement Agreement and the Underlying Defendants’ excess insurance policy, it seems somewhát unrealistic to expect future plaintiffs to settle their claims unless the defendants either assume liability or the primary carrier throws in its entire policy and the litigation continues towards a trial, which should obviously implicate the excess carrier. Of course, it seems that this problem would not occur if the excess carrier was the same carrier as the primary carrier. However, this is likely not the case for many insureds. See Scott M. Seaman & Charlene Kittredge, Excess Liability Insurance: Law and Litigation, 32 Tort & Ins. L.J. 653, 653-54 (1997) (observing that “the importance of excess insurance and the role of excess insurers as active participants in coverage litigation ha[s] grown exponentially” due to a variety of factors, including the increased issuance of “excess insurance contracts as commercial and professional insureds purchase excess coverage as part of comprehensive risk management programs,” the “increased exposures of the insureds” due to substantive legal changes, and the “high ' monetary stakes” accompanying coverage disputes).
Likewise, it appears equally unrealistic to expect insured defendants to agree to assume liability with no assurance that their excess policy would cover the portion *51 of liability that exceeds their primary coverage. After all, defendants rely on then-excess insurance policies, and eschew assumptions of liability, because these policies “are risk-spreading devices. They exist primarily because the stakes of liability to an insured are greater than they are to the insurer, which can spread the loss across all of its customers.” Trs. of the Univ. of Pa. v. Lexington Ins. Co., 815 F.2d 890, 901 (3d Cir. 1987). However, the risk that an excess insurer might, as has occurred here, refuse to cover means that an underlying defendant, facing the potential of millions of dollars in liability and having purchased insurance precisely to avoid the type of potential liability in question, will push for a result that is similar to what occurred here: a settlement that includes a release of liability or a covenant not to execute, and an assignment of rights to sue on the excess policy to the plaintiff.[11]
Simply put, I am concerned that parties will be less likely to agree to settlements in disputes where the primary coverage is clearly inadequate. This outcome “run[s] counter to the well-accepted public policy favoring settlement of insurance disputes” and could create other “perverse incentives” for insurers, such as “encouraging [them] to disclaim their duties to defend” and, subsequent to this, their duty to indemnify. IMG Worldwide, Inc. v. Westchester Fire Ins: Co., 572 Fed.Appx. 402, 411-12 (6th Cir. 2014); see also 1 Barry R. Ostrager & Thomas R. Newman, Handbook on Ins. Coverage Disputes, § 6.03[b] (16th Ed. 2013) (noting that “the insured, having purchased both primary and excess coverage, cannot be abandoned by its insurers” (citing Hocker v. N.H. Ins. Co., 922 F.2d 1476 (10th Cir. 1991))).
To that end, many courts impose a duty to defend on excess carriers when the potential scope of liability plainly exceeds the limits of the primary policy.[12] Likewise, other jurisdictions have held that an insurer waives its right to rely on language in an insurance contract that limits the scope of an insured’s coverage when the insurer breaches its duty to defend.[13]
*52 Judge Lipez’s fine opinion alludes to both of these doctrines, but I wish to make my own views more explicit. Our holding today rightly emphasizes the importance placed on the plain language of insurance contracts and settlement agreements. However, we must not ignore the unique purpose of excess insurance coverage: “to protect the insured against the risk of costs exceeding the limits of primary coverage.” Pac. Emp’rs Ins. Co. v. Travelers Cas. & Sur. Co., 136 F.Supp.3d 211, 219 (D. Conn. 2015) (emphasis added). Because an excess carrier may otherwise shirk its responsibilities to its insureds if it is allowed to rely on the terms of a settlement agreement with impunity, courts should interpret the duty to defend broadly (at least when a plaintiff and underlying defendant reach a good-faith, collusion-free settlement that exhausts the primary carrier’s coverage).[14] See Metlife Capital Corp., 224 F.Supp.2d at 388 (stating that “[t]he duty to defend arises when the possibility exists, from a liberal interpretation of the pleadings, that the insured is protected by the policy issued, regardless of the final outcome of the case”). Similarly, a rigorous application of the waiver rule encourages excess insurers to fulfill their responsibilities under the duty to defend, thereby decreasing the occurrence of costly litigation. See Solo Cup Co. v. Fed. Ins. Co., 619 F.2d 1178, 1185 (7th Cir. 1980) (noting that “one of the basic purposes of’ the duty to defend is the “protection of the insured from the expenses of litigation”).
Unfortunately, Massachusetts case law currently offers few insights into these issues.[15] Our analysis, to some extent, is also affected by Salvati not raising some arguments that may have led to a different outcome. See ante, at 48 (noting, among other things, that Salvati “does not contend that AIC somehow waived the right to rely on [the text of the indemnification provision], perhaps through its continued *53 refusal to defend or indemnify the Underlying Defendants”). Even so, one would anticipate that when a Massachusetts court eventually does encounter another plaintiff in Salvati’s position who raises these arguments, it will consider the practical effects of its decision on plaintiffs, insureds, and insurers throughout the Commonwealth.

. See Campione v. Wilson, 422 Mass. 185, 661 N.E.2d 658, 663 (1996) (noting the importance of "givfing] effect to” heavily-negotiated insurance settlements, especially where "the plaintiffs have voluntarily assumed the burden of proving any claims that [an underlying defendant] may have against [an excess insurer],” the underlying defendant’s "liability for the accident is reasonably clear, the primary insurer has paid the full limits of its policy, and damages are substantial”).

. These types of settlements are not only attractive cost-saving options for litigants, but frequently necessary ones in cases where, like this one, an insurance carrier abandons its insured or its insured’s assignee. See, e.g., Foremost Cty. Mut. Ins. Co. v. Home Indem. Co., 897 F.2d 754, 759 (5th Cir. 1990) (noting that in situations where the insurer has refused to provide coverage and refused to participate in the defense of the insured, “the insured often can protect himself only with a covenant not to execute”).

. See, e.g., Metlife Capital Corp. v. West-chester Fire Ins. Co., 224 F.Supp.2d 374, 388 (D.P.R. 2002) ("[I]n circumstances where the claim against the insured equals an amount exceeding the primary policy limits, the excess insurer’s duly to defend may also be triggered.”); Royal Ins. Co. of Am. v. Reliance Ins. Co., 140 F.Supp.2d 609, 618 (D.S.C. 2001) (holding that a prayer for relief that clearly implicated excess policy limits triggered an excess carrier’s duty to defend); Phico Ins. Co. v. Aetna Cas. & Sur. Co. of Am., 93 F.Supp.2d 982, 993-94 (S.D. Ind. 2000) (concluding that an excess insurer owed a duty to its insured once the excess insurer understood that the primary policy would be exhausted); Am. Motorists Ins. Co. v. Trane Co., 544 F.Supp. 669, 692 (W.D. Wis. 1982), aff'd, 718 F.2d 842 (7th Cir. 1983) (stating that "if the claim against the insured exceeds the monetary limits set by the underlying insurer, the excess insurer’s duty to defend is usually activated, even if the underlying insurer undertakes the defense as well”); cf. House of Clean, Inc, v. St. Paul Fire & Marine Ins. Co., 775 F.Supp.2d 302, 306-07 (D. Mass. 2011) (finding that a primary insurer breached its duty to defend because it was on notice that the potential scope of liability would fall within the applicable policy but nonetheless failed to defend the insured).

.See, e.g., Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co., 480 F.3d 1254, 1260-61 (11th Cir. 2007) (stating that an insurance contract's " 'legally obligated to pay’ language *52 does not block an otherwise valid coverage obligation when an insurer refuses to defend the insured and the injured party enters into a reasonable and good faith settlement that precludes proceeding against the insured” (citing Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., 851 So.2d 466, 490 (Ala. 2002))); Jones v. S. Marine & Aviation Underwriters, Inc., 888 F.2d 358, 361 (5th Cir. 1989) (noting that an insurer may waive the right to rely on the "legally obligated to pay” language contained in the applicable insurance policy once the insurer breaches its defense obligation to an insured).

. Of course, the dangers of possible collusion between the insured, the primaiy insurance carrier, and the plaintiff means that courts must always take steps to ensure that settlements are reached in good faith. See Campione, 661 N.E.2d at 663 (stating that Massachusetts courts "do not ignore the risk that, when a prejudgment settlement is combined with a release and covenant not to execute in favor of the tortfeasor, collusion may exist between the injured party and the tortfeasor”). However, these concerns are mitigated in this case because AIC participated in the mediation sessions and presumably kept itself informed of the settlement discussions.

. Nonetheless, Massachusetts courts have found that in cases of ambiguous language in insurance contracts, the excess carrier may be required to "drop down” and cover an insured party after a policyholder enters into a settlement and the full scope of primary coverage is unavailable (e.g., if the primary insurer is insolvent). See, e.g., Mass. Bay Transp. Auth. v. Allianz Ins. Co., 413 Mass. 473, 597 N.E.2d 439, 443 (1992) (upholding validity of "drop down” coverage in excess insurance contracts but finding relevant insurance contract unambiguous); Gulezian v. Lincoln Ins. Co., 399 Mass. 606, 506 N.E.2d 123, 124 (1987) (stating that an ambiguous insurance contract "should be read to drop down to provide indemnity coverage to the extent that [the primary insurer’s] insolvent estate does not”). These cases hint at the willingness of Massachusetts courts to consider interpreting contractual language establishing an excess insurer’s duty to defend in a broad manner, at least in some circumstances.