**SOUTHERN UNION COMPANY,**
Plaintiff

v.

**LIBERTY MUTUAL INSURANCE
COMPANY, Defendant.**

Civil Action No. 06–12067–RCL.

United States District Court,
D. Massachusetts.

July 24, 2008.

Laura B. Angelini, Hinckley, Allen and Snyder, Boston, MA, Kathleen Kapetanovic, Jerry L. Mitchell, Norman W. Peters, Jr., Kasowitz, Benson, Torres & Friedman LLP, Houston, TX, Gerald J. Petros, Hinckley Allen Snyder LLP, Providence, RI, for Plaintiff.

John E. Matosky, Joseph S. Sano, Prince, Lobel, Glovsky & Tye LLP, Boston, MA, for Defendant.

## ORDER ON REPORT AND RECOMMENDATION

WILLIAM G. YOUNG, District Judge.

Order entered approving Report and Recommendations.

**CONSOLIDATED REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** (Docket # 51) **and PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** (Docket # 56)

ALEXANDER, United States Magistrate Judge.

Plaintiff, Southern Union Company ("Southern Union"), filed suit against Liberty Mutual Insurance Company ("Liberty Mutual") on November 14, 2006, alleging Liberty Mutual refuses to defend Southern Union in a number of actions against it for damages resulting from hazardous waste disposal and contamination. Southern Union further alleges Liberty Mutual's refusal is a breach of its duty to defend as required by various insurance policies. The central issue in this litigation is the parties' disagreement over the very existence of these insurance policies and the alleged terms contained therein.

On April 13, 2007, District Judge Lindsay referred this case to this Court for a series of Reports and Recommendations on numerous motions. Here, this Court is

faced with two dispositive motions: Liberty Mutual's Motion for Summary Judgment Regarding the Contents of the Alleged Policies (Docket # 51) and Southern Union's Motion for Partial Summary Judgment (Docket # 56).

## FACTUAL BACKGROUND

Southern Union is currently the defendant in four lawsuits in the United States District Court for the District of Rhode Island ("Rhode Island Litigation").[1] The plaintiffs in those suits assert claims for property damage and personal injury as a proximate result of alleged activities arising from the Fall River Gas Manufacturing Gas Plant ("FRG") in Fall River, Massachusetts.[2] Southern Union avers that the alleged acts leading to the Rhode Island Litigation occurred during the period, between 1941 and 1954, when Liberty Mutual insurance policies provided Comprehensive General Liability ("CGL") coverage to FRG, which allegedly included a "duty to defend" provision.

In the course of the Rhode Island Litigation, Southern Union claims it has expended, and will continue to expend, significant money for attorneys fees and other costs of litigation that should be covered by Liberty Mutual under the duty to defend clause in the insurance policies. To date, Liberty Mutual refuses to undertake Southern Union's defense in the Rhode Island Litigation for reasons explained below.

This case is one of simple breach of contract, in which an insured seeks to hold its insurer to the terms of the policy(s). However, there is a twist: neither Southern Union nor Liberty Mutual have copies of the insurance policies Southern Union avers create the duty to defend. Moreover, there is no direct evidence of the contents of the alleged policies.

Southern Union provided this Court with the following secondary evidence it alleges proves the existence and contents of the policies:

- Invoices and statements purportedly generated by Liberty Mutual in the 1940's;
- Accounting and payment records of FRG from the 1940's;
- Correspondence between Stone & Webster Service Corporation[3] and FRG, and correspondence between Liberty Mutual and FRG; and
- Policy Jackets and related policy documents purportedly issued by Liberty Mutual.

Put another way, this secondary evidence, alleges Southern Union, consists of premium invoices, statements of accounts, cancelled checks, and correspondence establishing the policies were issued. *See* Southern Union Memorandum at 1 (Docket # 57). From these documents, Southern Union alleges the subject policy numbers to be as follows: PL–334613, PL–357407, CGL–01–00765, CGL–2S–90499, CGL–2S–70183, CGL–2S–70256, CGL–2–200158–51, CGL–20 200158–52, and LB–20 200158–53. Further, Southern Union deposed Jerry McCullough, Liberty Mutual's expert, who agreed that Liberty Mutual wrote policies for FRG under some of the above-referenced policy numbers.

1. The four suits are: (1) *Bigelow, et al. v. New England Gas Co. f/k/a Fall River Gas Co.,* C.A. No. 05–370T; (2) *Reis, et al. v. S. Union Co.,* C.A. No. 05–522T; (3) *Corvello, et al. v. New England Gas Co., Inc.,* C.A. No. 05–221T; and (4) *Burns, et al. v. S. Union Co. d/b/a Fall River Gas Co. & New England Gas Co.,* C.A.

No. 05–274T. *See* Southern Union Exhibits 4–8.

2. Southern Union is the successor to FRG.

3. Stone & Webster was the entity that managed the Fall River gas plant. *See* Southern Memorandum at 6 (Docket # 57).

McCullough Dep. 87:1–6. These policy numbers are consistent with the forms used by Liberty Mutual during the relevant time period. McCullough Dep. 76:19–78:25. During that same time period, Liberty Mutual's CGL forms commonly contained a duty to defend clause. McCullough Dep. 46:14–47:16, 48:6–24.

## DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil procedure entitles a party to the benefits of summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment is appropriate if there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A fact is 'material' if, based on the substantive law at issue, it might affect the outcome of the case. A material issue is 'genuine' if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor." *CORALations v. United States EPA,* 477 F.Supp.2d 413, 415–16 (D.Puerto Rico 2007) (internal citations omitted).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the movant has met this initial burden, "the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997). Like the First Circuit, this Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir. 1995). Finally, the fact that the parties have filed cross-motions for summary judgment does not change the Rule 56 calculus. *See Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir.1996) ("Cross motions simply require [this Court] to determine whether either of the parties deserves summary judgment as a matter of law on facts that are not disputed").

### B. Lost Policy Standard

 As previously mentioned, neither Southern Union nor Liberty Mutual have copies of the alleged policies crucial to the outcome of this litigation. This Court may fairly conclude that they are lost. Under Massachusetts law,[4] Southern Union, the proponent of the lost insurance policies, has the burden of proving (1) the instruments were issued and (2) the terms contained in the instruments. *See Kleenit, Inc. v. Sentry Ins. Co.,* 486 F.Supp.2d 121, 125–26 (D.Mass.2007); *Markline Co., Inc. v. Travelers Ins. Co.,* 384 Mass. 139, 140, 424 N.E.2d 464 (1981); *Employers' Liability Assurance Corp., Ltd. v. Hoechst Celanese Corp.,* 43 Mass.App.Ct. 465, 484, 684 N.E.2d 600 (1997). Southern Union must make this showing by a preponderance of the evidence. *See Rubenstein v.*

---

4. This Court, sitting in diversity, must follow the State standard on burden of proof because it is substantive in nature. *Am. Title Ins. Co. v. E.W. Fin. Corp.,* 959 F.2d 345, 348 (1st Cir.1992) (citing *Palmer v. Hoffman,* 318 U.S. 109, 117, 63 S.Ct. 477, 87 L.Ed. 645 (1943)). *See also Erie v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (the federal court is to apply state substantive law in a diversity case).

*Royal Ins. Co. of Am.*, 44 Mass.App.Ct. 842, 846, 694 N.E.2d 381 (1998) (explaining that a more stringent burden of proof is for those cases where "a strong likelihood that fraud, or of wrongdoing existed"); *Kleenit, Inc.*, 486 F.Supp.2d at 126 n. 2 ("the preponderance of the evidence standard governs regardless [whether federal or Massachusetts law] is applied."). Besides establishing the standard of proof in Massachusetts lost policy cases, *Rubenstein* teaches "[t]hat a policy has been lost or destroyed does not mean that its existence and contents may not be reconstructed from business records, underwriter's folios, or billings of the insurance company to the insured." *Rubenstein*, 44 Mass.App.Ct. at 846, 694 N.E.2d 381.

### i. Existence of the Policies

The analysis into the existence of the alleged policies is separate and distinct from the analysis into the contents of the alleged policies. This Court will first decide whether there is a genuine issue of material fact as to the insurance policies' existence. Southern Union avers its proffered evidence **irrefutably establishes** that the policies were issued. (emphasis added) *See* Southern Union Memorandum at 1 (Docket # 57). Liberty Mutual, in its Memorandum of Opposition, avers that material issues of fact remain regarding the existence of the policies. *See* Liberty Mutual Memorandum at 8 (Docket # 59).

To properly address the question as to whether the policies existed, this Court finds it necessary to consider the datum provided by Liberty Mutual regarding each alleged policy. Accordingly, this Court will address each alleged policy *seriatim:*

**5.** According to Southern Union's expert, Robert N. Hughes, the SU is the "Bates prefix"

1. **Exhibit 14—Alleged Policy Number PL–334613**
—Voucher No. 8 63 dated August 1940, with the amount of invoices calculated to be $42.63. (SU 000093)[5]
—Statement of Premium Account as of August 19, 1940. The statement shows a Dividend of $9.16 and a Balance of $42.63. (SU 000095)

2. **Exhibit 15—Alleged Policy Number PL–357407**
—Voucher No. 8 63 dated August 1940 with the amount of invoices calculated to be $42.63. (SU 000093)
—The Statement of Premium Account shows this policy number having a corresponding premium charge of $51.79. (SU 000095)
—Voucher No. 9 214 dated September 1943 with dollar figures provided in the "Amount of Invoices" column. (SU 000097)
—Premium Adjustment and Dividend for the period July 19, 1940 to August 1, 1943, showing a General Liability Premium of $51.79 for Policy Number PL–357407–GL. (SU 000099)

3. **Exhibit 16—Alleged Policy Number CGL–01–00765**
—Invoice for Workmen's Compensation Comprehensive Liability policy in the amount of $1,116.74, dated September 1, 1943. The effective date range of the policy is purportedly from August 1, 1943 to August 1, 1946. (SU 000101)
—Credit Invoice for $3.37 dated September 22, 1943. (SU 000103)
—General Ledger Account for Prepaid Insurance; includes debit, credit, and balance calculations. (SU 000133–SU 000134)

indicating the document came from Southern Union. *See* Hughes Dep. 10:15–22.

—Voucher No. 8 23 dated August 1944. The voucher provides the date of the invoice as August 1 (no year given, presumably 1944), with the amount of the invoice calculated to be $49.05. (SU 000143)

—Invoice with an effective date of August 1, 1944; the balance due calculated to be $49.05. (SU 000145)

—Cancelled check for $49.05 dated August 16, 1944. (SU 000144)

—Voucher No. 1 83 dated January 1946; the check totals are $3,368.05. (SU 000146) [6]

—Cancelled check for $3,368.05 dated January 30, 1946. Voucher No. 1 83 appears on the check. (SU 000147)

—Invoice for $3,546.36 dated November 5, 1946; the period is from August 1, 1943 to August 1, 1945. (SU 000148)

—Invoice for $32.70 dated December 10, 1945. (SU 000149)

—Invoice for $211.51 dated January 2, 1946. (SU 000150)

—Voucher No 1 145 dated January 1947; the date of the invoices is January 22 (no year given, presumably 1947) with an amount of $2,673.39. (SU 000151)

—Cancelled check for $2,673.39 dated February 3, 1947; Voucher No 1 145 is listed on the check. (SU 000152)

—Statement of Account as of January 22, 1947 for $2,673.39.[7] (SU 000153)

—Summary of Premium Bills, Statement of Dividend Earned, and Premium Adjustment Statement dated June 6, 1947. (SU 0001555–SU 000158)

4. **Exhibit 17—Alleged Policy Number CGL–2S–90499**

—General Ledger for Prepaid Insurance; no date given. (SU 000131–SU 000132)

—Voucher No 1 145 dated January 1947. (SU 000151)

—Cancelled check for $2,673.39 dated February 3, 1947; Voucher No 1 145 is present on the check. (SU 000152)

—Statement of Account as of January 22, 1947; balance due of $2,673.39. (SU 000153)

—Invoice for Comprehensive General Liability in the amount of $2,540.55, dated November 4, 1946. (SU 000154 and SU 000184)

—Voucher No 8 68 dated August 1947. The check totals are for the sum of $1,528.58 (SU 000203)

—Cancelled check for $1,528.58 dated August 27, 1947. Voucher No 8 68 is present on the check. (SU 000204)

—Invoice for $1,524.33 dated August 18, 1947. (SU 000205) [8]

—Voucher No 7 252 dated July 1949; the amount of invoices is $1,693.75 (SU 000206)

—Invoice for $1,693.75, dated July 25, 1949. Policy number ending 90499 is listed on the invoice. (SU 000207)

—Voucher 9 253 dated September 1949; the amount of invoices is $2,604.87. (SU 000208)

—Premium Adjustment and Dividend for the period August 1, 1948—August 1, 1949; date of this invoice is September 14, 1949. (SU 000209)

---

6. The Court has difficulty reading the numbers on this voucher statement.

7. Policy number CGL–2S–90499 (Exhibit 17) is also listed on this Statement of Account.

8. This invoice also references ITGI–83–8107 with a balance due of $4.25.

5. **Exhibit 18—Alleged policy number CGL–2S–70183**

—General Ledger Account for Prepaid Insurance; the term is from August 1, 1949 to August 1, 1950. (SU 000130–SU 000168)

—Invoice for $2,490.04 dated September 23, 1949. (SU 000210–SU 000211)—barely legible.

—Voucher 9 253 dated September 1949. The amount of the September 14 (no year given, presumably 1949) Invoice is $114.83 and the amount of the September 23 (no year given, presumably 1949) Invoice is $2,490.04, for a total of $2,604.87. (SU 000226)

—Premium Adjustment and Dividend for August 1, 1948 to August 1, 1949. The Balance Due is $114.83. (SU 000227)

—Invoice for $2,490.04 dated September 23, 1949. (SU 000228) (same as SU 000210)

6. **Exhibit 19—Alleged policy number CGL–2S–70256**

—General Ledger Account for Prepaid Insurance; the term is from August 1, 1950 to August 1, 1951. (SU 000129; SU 000167)

—Voucher No 9 96 dated September, 1950. The amount of the September 12 Invoice is $16.29 and the amount of the September 21 Invoice is $1,999.10, for a total of $2,015.39. (SU 000244)

—Dividend Information and Payment dated September 28, 1950. (SU 000248)

—Invoice for $1,999.10 dated September 21, 1950. The term is August 1, 1950 to August 1, 1951. (SU 000247)

—Dividend and Payment Terms. (SU 000245)

—Voucher No 11 56 dated November, 1951. The amount of the October 25 (no year given, presumably 1951) Invoice is $5,174.78 and the amount of the November 19 (no year given, presumably 1951) Invoice is $278.40. The check totals equal $4,896.38. (SU 000264) This Voucher, and accompanying Invoice (SU 000265), appear to relate to Policy number CGL–2–2001158–51 with effective date of August 1, 1951; yet, Southern Union included this Voucher and Invoice as evidence of establishing the existence of Policy Number CGL–2S–70256. Clarification is needed.

—Invoice dated November 5, 1951; the Balance Due is $278.40 (SU 000266)

7. **Exhibit 20—Alleged Policy Number CGL–2–200158–51**

—Voucher 11 56 dated November, 1951. The Invoice dated October 25 is for the amount of $5,174.78. (SU 000264)

—Invoice for $5,174.78 dated October 25, 1951.

8. **Exhibit 21—Alleged Policy Number CGL–20 200158–52**

—Audit Premium Invoice—unfortunately, this invoice is illegible, hence this Court is unable to discern whether this particular invoice references Policy Number ending in 158–52.

9. **Exhibit 22—Alleged Policy Number LB 20–200158–53**

—Voucher 10–113 dated October 1953. The September 24 Invoice is in the amount of $17,558.34. (SU 000366)

—Invoice for $17,558.34 dated September 24, 1953. (SU 000367)

—Dividend Information and Payment Terms. (SU 000368)

■ In order for Southern Union to introduce the above policy numbers and accompanying documents into evidence, this Circuit requires it to "show that [it] has used all reasonable means to obtain the original, i.e., such search as the nature of the case would suggest." *Sylvania Elec.*

*Products, Inc. v. Flanagan,* 352 F.2d 1005, 1008 (1st Cir.1965). This Court must determine whether Southern Union used all reasonable means. *Contrast Burt Rigid Box v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 92 (2d Cir.2002) (although the Second Circuit speaks of "diligence" rather than "reasonable means," FRE 104(a) controls, which gives a court the prerogative to answer preliminary questions about the admissibility of evidence).

Liberty Mutual attests that Southern Union fails to make such a showing by affidavit or other document, warranting prohibition of the use of this secondary evidence. *See* Liberty Mutual Memorandum at 6 (Docket # 59). This argument, not addressed by Southern Union, is meritless because Southern Union **did** produce such an affidavit. *See* (Docket # 62). The affiant, Ms. Anne O'Connor, a former Southern Union employee and custodian of FRG's historical records during her tenure, asserts that "[a]fter a thorough search, the original policies issued by Liberty Mutual to Fall River Gas were not found." This Court, as it may, concludes this affidavit indicates Southern Union, or its agents, conducted a thorough and reasonable search to find the original policies.

As to the precise question of the existence of the policies, it is necessary to compare the facts at bar with those in *Kleenit.* In that case, Magistrate Judge Collings found, contrary to Kleenit's contention, that there was insufficient evidence to establish a factual dispute as to the existence and terms of the missing policy for the years 1964–1967. *Kleenit,* 486 F.Supp.2d at 127.[9] Judge Collings concluded that although the evidence did show Kleenit making payments "for some sort of insurance," the evidence, consisting of deposition testimony of a Mr. Crider,

would "offer only surmise and conjecture concerning the existence ... of the missing policy here." *Id.* This conclusion is in line with the First Circuit's holding that a party's submission of allegations and conjecture, unsupported in the record, are insufficient to raise a genuine issue of material fact. *See August v. Offices Unlimited, Inc.,* 981 F.2d 576, 580 (1st Cir.1992).

■ Here, however, Southern Union offers more than just evidence of payment of "some sort of insurance." Southern Union provided this Court with exhibits containing policy numbers, dates, and, most importantly vouchers, cancelled checks, and invoices/statements of accounts with matching dates and dollar figures. For example, Southern Union produced alleged policy number CGL–01–00765, a.k.a. Exhibit 16, with evidence consisting of Voucher No. 1 83 dated January 1946, with $3,368.05 listed as the check total. Within this same exhibit is a cancelled check dated January 30, 1946 in the amount of $3,368.05. Voucher No. 1 83 appears on the right hand corner of the check. Moreover, the check bears Liberty Mutual's insignia.

■ This Court, like Judge Collings in *Kleenit* with respect to the 1967–1970 policies, finds that the exhibits are evidence "sufficient to create a triable issue on the existence of the insurance policies for the time frames indicated." *Kleenit,* 486 F.Supp.2d at 130. It is well-established that, at trial, the existence of the lost policies may be shown through admissible evidence such as business records, underwriter's folios, billings to the insured, evidence of type of coverage, dates of coverage and coverage amounts. *Metlife Capital Corp. v. Westchester Fire*

---

**9.** *Kleenit* also involved an issue as to the existence of alleged insurance policies from 1967–1970. Judge Collings strongly suggest-

ed there may have been an issue of fact as to the existence of policies from 1967–1970. *See Kleenit,* 486 F.Supp.2d at 130.

*Ins. Co.*, 224 F.Supp.2d 374, 386–87 (D.P.R.2002); *Rubenstein*, 44 Mass.App. Ct. at 846, 694 N.E.2d 381. In *Metlife*, the District Court of Puerto Rico found Westchester, the policy proponent, did not meet its burden of proving the existence of the policy because the evidence, consisting of certificates and confirmations of insurance, was contradictory and confusing due to discrepancies in policy numbers and the mention of four companies possibly providing insurance. *Metlife*, 224 F.Supp.2d at 386. Here, there are no discrepancies in policy numbers except perhaps for Exhibit 19, which can likely be attributed to a clerical error by Southern Union counsel. Furthermore, the evidence contained in the other policy number exhibits (Southern Union Exhibits 14–22), notably Exhibit 16, is consistent and self-verifying.

Viewing the evidence in the light most favorable to Southern Union, *see Barbour*, 63 F.3d at 36, this Court finds that the exhibits create a trialworthy dispute as to the existence of the policies, and finds Southern Union can meet its burden of proving their existence by a preponderance of the evidence. Therefore, it is unnecessary to examine the other evidence put forth by Southern Union such as expert affidavits. Nevertheless, this Court declines Southern Union's invitation to hold that the exhibits "irrefutably establish" the existence of the policies as a matter of law because of the several permissible inferences that one could draw from this evidence. Accordingly, this Court agrees with Liberty Mutual that there is at least one genuine issue of material fact with respect to the existence of the alleged policies, and RECOMMENDS denying Southern Union's Motion for Partial Summary Judgment.

*ii. The terms of these alleged policies*

■ Having determined that a genuine issue of material fact exists as to whether the alleged policies exist, and having denied Southern Union's Motion for Partial Summary Judgment, this Court now turns its attention to the issue of whether a material issue of fact exists as to the contents of those alleged policies. This determination is made difficult by the mountain of secondary evidence provided by Southern Union in opposition to Liberty Mutual's motion. As Liberty Mutual should know, Federal Rule of Evidence 1004 permits Southern Union to provide secondary evidence of the policies' terms. *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 810 F.Supp. 1420, 1426 (D.Del.1992).

■ Evidence consisting of policy numbers, ledgers reflecting payments to an insurer, dates, and dollar amounts, although arguably sufficient to create a triable issue of existence of insurance policies, is insufficient to prove the terms of the policies. *See Kleenit*, 486 F.Supp.2d at 130 (this evidence "says nothing about the specific material terms of the policies" and Kleenit, in opposing summary judgment, did not produce any evidence establishing the material terms); *accord Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 975 F.2d 1130, 1132–33 (5th Cir.1992) (relying on Texas state law). Therefore, the evidence presented in the foregoing analysis with respect to the policies' existence, without more, would result in this Court granting Liberty Mutual's motion for summary judgment.

■ Because of the absence of the original policies, Southern Union is essentially forced to rely on secondary evidence in proving their material terms. Secondary evidence is "that species of evidence which becomes admissible, when the primary or best evidence of the fact in question is lost or stolen." *Black's Law Dictionary* 1351 (6th ed.1990). Of course, this evidence must be admissible. *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir.2000).

This evidence must also meet the requirements of Federal Rule of Evidence 1004, which permits its proponent not to have to rely on the original writing so long as the it did not destroy the originals in bad faith. *Paul Revere Variable Annuity Ins. Co. v. Zang*, 81 F.Supp.2d 227 (D.Mass.2000) (explaining that the party opposing admission must prove the proponent acted in bad faith); *United States v. Balzano*, 687 F.2d 6 (1 st Cir.1982). Liberty Mutual does not claim Southern Union either intentionally or negligently lost the original insurance policies. Moreover, Liberty Mutual has an internal policy of destroying policies seven years after they expire. *See* (Docket # 61, Exhibit 5). Therefore, this Court finds Liberty Mutual fails to prove Southern Union destroyed the originals in bad faith.

 The secondary evidence introduced by Southern Union to demonstrate a triable issue on the material terms constitutes affidavits, depositions, sample forms, correspondence, expert reports, and other material which Southern Union avers "reconstructs" the ancient policies. *See* Southern Union Exhibits 11–33. In *Kleenit*, Judge Collings noted that "a putative insured may seek to create a trial worthy dispute of fact by introducing evidence that standard policy forms or specimen forms reasonably supply the terms of the lost policy. *Kleenit*, 486 F.Supp.2d at 132. This Court finds that Southern Union has introduced such evidence. For example, each of the seven sample Comprehensive General Liability Policy forms (labelled as GPO 1455) provided by Southern Union contain the word "defend" under the subheading "DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS." *See* SU Exhibit 13. Furthermore, GPO 1455 was a form policy jacket used by Liberty Mutual to write CGL coverage in the 1940's and 1950's. McCullough Dep. 44:9–15. Mr. McCullough also stated that the Mutual Casualty Insurance Rating Board ("MCIRB") promulgated the form that Liberty Mutual used for its CGL policy jacket in the 1940's, and such forms contained "standardized language that was being used for the most part, subject to underwriting considerations for all clients."[10] McCullough Dep. 33:6–34:24. This pronouncement is consistent with Mr. Hughes' deposition testimony that "in every single one of those [archaic coverage] cases, the Liberty representatives testified that Liberty always used standardized forms." Hughes Dep. 22:1–13. Likewise, in these standardized CGL policies, language such as "defend any suit" is a common feature. McCullough Dep. 48:6–24. Finally, according to Mr. McCullough, less than ten percent of all CGL policies contained endorsements removing "duty to defend" language from the policy. McCullough Dep. 63:9–18.

In addition, Southern Union produced a letter from a Liberty Mutual agent to a Fall River Gas agent dated September 13, 1951 which buttresses its position that Liberty Mutual had a positive duty to defend. *See* SU Exhibit 11. The letter contains three clauses which, when read in conjunction, raise a genuine issue of fact as to the terms of the policy: (1) "your policy contract with us;" (2) "for one person injured;" and (3) "we shall give this suit proper attention within the limits of your policy." This letter could support the inference that Fall River Gas had a policy covering personal injury, and such policy contained a "duty to defend" clause which Liberty Mutual was honoring by providing for a defense.

---

**10.** Liberty Mutual was a member of MCIRB in good standing during the relevant time period. *See* McCullough Dep. 34:22–24.

Granted, there are other pieces of evidence Southern Union advances in support of its argument that summary judgment in Liberty Mutual's favor is improper. However, the evidence alighted in the preceding two paragraphs, in conjunction with Southern Union Exhibits 14–22, is sufficient in this Court's view to find a dispute of fact as to whether the lost policies contained a duty to defend clause within the four corners of the documents. Lastly, it bears mentioning that Liberty Mutual's membership in an organization that promulgated standard CGL forms is particularly persuasive. Other courts dealing with a lost policy issue have been similarly swayed by such membership. *See e.g., Americhem Corp. v. St. Paul Fire and Marine Ins. Co.,* 942 F.Supp. 1143 (W.D.Mich.1995) (plaintiff survived summary judgment because it offered specimen copies of a declarations form and a coverage form, asserted by the plaintiff to be state-approved CGL forms used by the defendant during the relevant time frame); *Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.,* 173 Misc.2d 901, 661 N.Y.S.2d 948, 951 (N.Y.Sup.Ct.1997) (plaintiff survived summary judgment because defendant policy issuer was a member of an Underwriters Bureau during the time period at issue, and "on occasion, used specimen forms that followed the [Bureau's] forms for CGL policies").

Judge Collings' *Kleenit* opinion cautions courts against indulging a speculative inference in a non-moving party's favor when there is no "hint that the terms of the missing policy matched those of a standard policy." *Kleenit,* 486 F.Supp.2d at 134. The evidence provided by Southern Union does not require this Court to draw unwarranted inferences in its favor because it raises a genuine issue of material fact as to the material terms of the alleged policies. Therefore, this Court RECOMMENDS denying Liberty Mutual's Motion for Summary Judgment Regarding the Contents of the Alleged Policies.

## CONCLUSION

Accordingly, this Court RECOMMENDS that Liberty Mutual's Motion for Summary Judgment Regarding the Contents of the Alleged Policies (Docket # 51) and Southern Union's Motion for Partial Summary Judgment (Docket # 56) be DENIED.

SO ORDERED.

June 25, 2008